(Slip Opinion)                OCTOBER TERM, 2008                1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## KENNEDY, EXECUTRIX OF THE ESTATE OF KENNEDY, DECEASED *v.* PLAN ADMINISTRATOR FOR DuPONT SAVINGS AND INVESTMENT PLAN ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

No. 07–636.   Argued October 7, 2008—Decided January 26, 2009

The Employee Retirement Income Security Act of 1974 (ERISA), as relevant here, obligates administrators to manage ERISA plans "in accordance with the documents and instruments governing" them, 29 U. S. C. §1104(a)(1)(D); requires covered pension benefit plans to "provide that benefits . . . may not be assigned or alienated," §1056(d)(1); and exempts from this bar qualified domestic relations orders (QDROs), §1056(d)(3). The decedent, William Kennedy, participated in his employer's savings and investment plan (SIP), with power both to designate a beneficiary to receive the funds upon his death and to replace or revoke that designation as prescribed by the plan administrator. Under the terms of the plan, if there is no surviving spouse or designated beneficiary at the time of death, distribution is made as directed by the estate's executor or administrator. Upon their marriage, William designated Liv Kennedy his SIP beneficiary and named no contingent beneficiary. Their subsequent divorce decree divested Liv of her interest in the SIP benefits, but William did not execute a document removing Liv as the SIP beneficiary. On William's death, petitioner Kari Kennedy, his daughter and the executrix of his Estate, asked for the SIP funds to be distributed to the Estate, but the plan administrator relied on William's designation form and paid them to Liv. The Estate filed suit, alleging that Liv had waived her SIP benefits in the divorce and thus respondents, the employer and the SIP plan administrator (together, DuPont), had violated ERISA by paying her. As relevant here, the District Court entered summary judgment for the Estate, ordering DuPont to pay the benefits to the Estate. The Fifth Circuit reversed, holding that

Liv's waiver was an assignment or alienation of her interest to the
Estate barred by §1056(d)(1).

*Held:*

　1. Because Liv did not attempt to direct her interest in the SIP
benefits to the Estate or any other potential beneficiary, her waiver
did not constitute an assignment or alienation rendered void under
§1056(d)(1). Pp. 5–13.

　　(a) Given the legal meaning of "assigned" and "alienated," it is
fair to say that Liv did not assign or alienate anything to William or
to the Estate. The Fifth Circuit's broad reading—that Liv's waiver
indirectly transferred her interest to the next possible beneficiary,
here the Estate—is questionable. It would be odd to speak of an es-
tate as the transferee of its own decedent's property or of the dece-
dent in his lifetime as his own transferee. It would also be strange
under the Treasury Regulation that defines "assignment" and "alien-
ation." Moreover, it is difficult to see how certain waivers not barred
by the antialienation provision *e.g.,* a surviving spouse's ability to
waive a survivor's annuity or lump-sum payment, see *Boggs* v. *Boggs,*
520 U. S. 833, 843; 29 U. S. C. §§1055(a), (b)(1)(C), (c)(2), would be
permissible under the Fifth Circuit's reading. These doubts, and ex-
ceptions calling the Fifth Circuit's reading into question, point the
Court toward the law of trusts that "serves as ERISA's backdrop."
*Beck* v. *PACE Int'l Union*, 551 U. S. 96, 101. Section 1056(d)(1) is
much like a spendthrift trust provision barring assignment or alien-
ation of a benefit, see *Boggs, supra,* at 852, and the cognate trust law
is highly suggestive here. The general principle that a designated
spendthrift beneficiary can disclaim his trust interest magnifies the
improbability that a statute written with an eye on the old law would
effectively force a beneficiary to take an interest willy-nilly. The
Treasury reads its own regulation to mean that the antialienation
provision is not violated by a beneficiary's waiver "where the benefi-
ciary does not attempt to direct her interest in pension benefits to
another person." Brief for United States as *Amicus Curiae* 18. Being
neither "plainly erroneous [n]or inconsistent with the regulation," the
Treasury Department's interpretation is controlling. *Auer* v. *Rob-
bins*, 519 U. S. 452, 461. ERISA's QDRO provisions shed no light on
the validity of a waiver by a non-QDRO. Pp. 5–11.

　　(b) DuPont's additional reasons for saying that ERISA barred
Liv's waiver are unavailing. Pp. 11–13.

　2. Although Liv's waiver was not nullified by §1056's express
terms, the plan administrator did its ERISA duty by paying the SIP
benefits to Liv in conformity with the plan documents. ERISA pro-
vides no exception to the plan administrator's duty to act in accor-
dance with plan documents. Thus, the Estate's claim stands or falls

by "the terms of the plan," 29 U. S. C. §1132(a)(1)(B), a straightforward rule that lets employers "'establish a uniform administrative scheme, [with] a set of standard procedures to guide processing of claims and disbursement of benefits,'" *Egelhoff* v. *Egelhoff*, 532 U. S. 141, 148. By giving a plan participant a clear set of instructions for making his own instructions clear, ERISA forecloses any justification for enquiries into expressions of intent, in favor of the virtues of adhering to an uncomplicated rule. Less certain rules could force plan administrators to examine numerous external documents purporting to be waivers and draw them into litigation like this over those waivers' meaning and enforceability. The guarantee of simplicity is not absolute, since a QDRO's enforceability may require an administrator to look for beneficiaries outside plan documents notwithstanding §1104(a)(1)(D). But an administrator enforcing a QDRO must be said to enforce plan documents, not ignore them, and a QDRO enquiry is relatively discrete, given its specific and objective criteria. These are good and sufficient reasons for holding the line, just as the Court did in holding that ERISA preempted state laws that could blur the bright-line requirement to follow plan documents in distributing benefits. See *Boggs, supra,* at 850, and *Egelhoff, supra,* at 143. What goes for inconsistent state law goes for a federal common law of waiver that might obscure a plan administrator's duty to act "in accordance with the documents and instruments." See *Mertens* v. *Hewitt Associates*, 508 U. S. 248, 259. This case points out the wisdom of protecting the plan documents rule. Under the SIP, Liv was William's designated beneficiary. The plan provided a way to disclaim an interest in the SIP account, which Liv did not purport to follow. The plan administrator therefore did exactly what §1104(a)(1)(D) required and paid Liv the benefits. Pp. 13–18.

497 F. 3d 426, affirmed.

SOUTER, J., delivered the opinion for a unanimous Court.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 07–636

KARI E. KENNEDY, EXECUTRIX OF THE ESTATE OF WILLIAM PATRICK KENNEDY, DECEASED, PETITIONER *v*. PLAN ADMINISTRATOR FOR DuPONT SAVINGS AND INVEST-MENT PLAN ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

[January 26, 2009]

JUSTICE SOUTER delivered the opinion of the Court.

The Employee Retirement Income Security Act of 1974 (ERISA), 88 Stat. 829, 29 U. S. C. §1001 *et seq*., generally obligates administrators to manage ERISA plans "in accordance with the documents and instruments governing" them. §1104(a)(1)(D). At a more specific level, the Act requires covered pension benefit plans to "provide that benefits . . . under the plan may not be assigned or alienated," §1056(d)(1), but this bar does not apply to qualified domestic relations orders (QDROs), §1056(d)(3). The question here is whether the terms of the limitation on assignment or alienation invalidated the act of a divorced spouse, the designated beneficiary under her ex-husband's ERISA pension plan, who purported to waive her entitlement by a federal common law waiver embodied in a divorce decree that was not a QDRO. We hold that such a waiver is not rendered invalid by the text of the antialienation provision, but that the plan administrator properly disregarded the waiver owing to its conflict with the designation made by the former husband in accordance with

plan documents.

## I

The decedent, William Kennedy, worked for E. I. Du-Pont de Nemours & Company and was a participant in its savings and investment plan (SIP), with power both to "designate any beneficiary or beneficiaries . . . to receive all or part" of the funds upon his death, and to "replace or revoke such designation." App. 48. The plan requires "[a]ll authorizations, designations and requests concerning the Plan [to] be made by employees in the manner prescribed by the [plan administrator]," *id.*, at 52, and provides forms for designating or changing a beneficiary, *id.*, at 34, 56–57. If at the time the participant dies "no surviving spouse exists and no beneficiary designation is in effect, distribution shall be made to, or in accordance with the directions of, the executor or administrator of the decedent's estate." *Id.*, at 48.

The SIP is an ERISA "'employee pension benefit plan,'" 497 F. 3d 426, 427 (CA5 2007); 29 U. S. C. §1002(2), and the parties do not dispute that the plan satisfies ERISA's antialienation provision, §1056(d)(1), which requires it to "provide that benefits provided under the plan may not be assigned or alienated."[1] The plan does, however, permit a beneficiary to submit a "qualified disclaimer" of benefits as defined under the Tax Code, see 26 U. S. C. §2518, which has the effect of switching the beneficiary to an "alternate . . . determined according to a valid beneficiary designa-

---

[1] The plan states that "[e]xcept as provided by Section 401(a)(13) of the [Internal Revenue] Code, no assignment of the rights or interests of account holders under this Plan will be permitted or recognized, nor shall such rights or interests be subject to attachment or other legal processes for debts." App. 50–51. Title 26 U. S. C. §401(a)(13)(A), in language substantially tracking the text of §1056(d)(1), provides that "[a] trust shall not constitute a qualified trust under this section unless the plan of which such trust is a part provides that benefits provided under the plan may not be assigned or alienated."

tion made by the deceased." Supp. Record 86–87 (Exh. 15).

In 1971, William married Liv Kennedy, and, in 1974, he signed a form designating her to take benefits under the SIP, but naming no contingent beneficiary to take if she disclaimed her interest. 497 F. 3d, at 427. William and Liv divorced in 1994, subject to a decree that Liv "is . . . divested of all right, title, interest, and claim in and to . . . [a]ny and all sums . . . the proceeds [from], and any other rights related to any . . . retirement plan, pension plan, or like benefit program existing by reason of [William's] past or present or future employment." App. to Pet. for Cert. 64–65. William did not, however, execute any documents removing Liv as the SIP beneficiary, 497 F. 3d, at 428, even though he did execute a new beneficiary-designation form naming his daughter, Kari Kennedy, as the beneficiary under DuPont's Pension and Retirement Plan, also governed by ERISA.

On William's death in 2001, petitioner Kari Kennedy was named executrix and asked DuPont to distribute the SIP funds to William's Estate. *Ibid.* DuPont, instead, relied on William's designation form and paid the balance of some $400,000 to Liv. *Ibid.* The Estate then sued respondents DuPont and the SIP plan administrator (together, DuPont), claiming that the divorce decree amounted to a waiver of the SIP benefits on Liv's part, and that DuPont had violated ERISA by paying the benefits to William's designee.[2]

_____

[2] The Estate now says that William's beneficiary-designation form for the Pension and Retirement Plan applied to the SIP as well, but the form on its face applies only to DuPont's "Pension and Retirement Plan." App. 62. In the District Court, in fact, the Estate stipulated that William "never executed any forms or documents to remove or replace Liv Kennedy as his sole beneficiary under either the SIP or [a plan that merged into the SIP]." *Id.,* at 28. In any event, the Estate did not raise this argument in the Court of Appeals, and we will not

So far as it matters here, the District Court entered summary judgment for the Estate, to which it ordered DuPont to pay the value of the SIP benefits. The court relied on Fifth Circuit precedent establishing that a beneficiary can waive his rights to the proceeds of an ERISA plan "'provided that the waiver is explicit, voluntary, and made in good faith.'" App. to Pet. for Cert. 38 (quoting *Manning* v. *Hayes*, 212 F. 3d 866, 874 (CA5 2000)).

The Fifth Circuit nonetheless reversed, distinguishing prior decisions enforcing federal common law waivers of ERISA benefits because they involved life-insurance policies, which are considered "'welfare plan[s]'" under ERISA and consequently free of the antialienation provision. 497 F. 3d, at 429. The Court of Appeals held that Liv's waiver constituted an assignment or alienation of her interest in the SIP benefits to the Estate, and so could not be honored. *Id.*, at 430. The court relied heavily on the ERISA provision for bypassing the antialienation provision when a marriage breaks up: under 29 U. S. C. §1056(d)(3),[3] a court order that satisfies certain statutory requirements is known as a qualified domestic relations order, which is exempt from the bar on assignment or alienation. Because the Kennedys' divorce decree was not a QDRO, the Fifth Circuit reasoned that it could not give effect to Liv's waiver incorporated in it, given that "ERISA provides a specific mechanism—the QDRO—for addressing the elimination of a spouse's interest in plan benefits, but that mechanism is *not* invoked." 497 F. 3d, at 431.

We granted certiorari to resolve a split among the

———————

address it in the first instance. See *Taylor* v. *Freeland & Kronz*, 503 U. S. 638, 645–646 (1992).

[3] Section 1056(d)(3)(A) provides that the antialienation provision "shall apply to the creation, assignment, or recognition of a right to any benefit payable with respect to a participant pursuant to a domestic relations order, except that paragraph (1) shall not apply if the order is determined to be a qualified domestic relations order."

Courts of Appeals and State Supreme Courts over a divorced spouse's ability to waive pension plan benefits through a divorce decree not amounting to a QDRO.[4] 552 U. S. \_\_\_ (2008). We subsequently realized that this case implicates the further split over whether a beneficiary's federal common law waiver of plan benefits is effective where that waiver is inconsistent with plan documents,[5] and after oral argument we invited supplemental briefing on that latter issue, upon which the disposition of this case ultimately turns. We now affirm, albeit on reasoning different from the Fifth Circuit's rationale.

## II

### A

By its terms, the antialienation provision, §1056(d)(1), requires a plan to provide expressly that benefits be neither "assigned" nor "alienated," the operative verbs having histories of legal meaning: to "assign" is "[t]o transfer; as to assign property, or some interest therein," Black's Law Dictionary 152 (4th rev. ed. 1968), and to "alienate" is "[t]o convey; to transfer the title to property," *id.*, at 96. We think it fair to say that Liv did not assign or alienate anything to William or to the Estate later standing in his

_____

[4] Compare *Altobelli* v. *IBM Corp.*, 77 F. 3d 78 (CA4 1996) (federal common law waiver in divorce decree does not conflict with antialienation provision); *Fox Valley & Vicinity Constr. Workers Pension Fund* v. *Brown*, 897 F. 2d 275 (CA7 1990) (en banc) (same); *Keen* v. *Weaver*, 121 S. W. 3d 721 (Tex. 2003) (same), with *McGowan* v. *NJR Serv. Corp.*, 423 F. 3d 241 (CA3 2005) (federal common law waiver in divorce decree barred by antialienation provision).

[5] Compare *Altobelli*, *supra* (federal common law waiver controls); *Mohamed* v. *Kerr*, 53 F. 3d 911 (CA8 1995) (same); *Brandon* v. *Travelers Ins. Co.*, 18 F. 3d 1321 (CA5 1994) (same); *Fox Valley*, 897 F. 2d 275 (same); *Strong* v. *Omaha Constr. Industry Pension Plan*, 270 Neb. 1, 701 N. W. 2d 320 (2005) (same); *Keen*, *supra* (same), with *Metropolitan Life Ins. Co.* v. *Marsh*, 119 F. 3d 415 (CA6 1997) (plan documents control); *Krishna* v. *Colgate Palmolive Co.*, 7 F. 3d 11 (CA2 1993) (same).

shoes.

The Fifth Circuit saw the waiver as an assignment or alienation to the Estate, thinking that Liv's waiver transferred the SIP benefits to whoever would be next in line; without a designated contingent beneficiary, the Estate would take them. The court found support in the applicable Treasury Department regulation that defines "assignment" and "alienation" to include

> "[a]ny direct or indirect arrangement (whether revocable or irrevocable) whereby a party acquires from a participant or beneficiary a right or interest enforceable against the plan in, or to, all or any part of a plan benefit payment which is, or may become, payable to the participant or beneficiary." 26 CFR §1.401(a)–13(c)(1)(ii) (2008).

See *Boggs* v. *Boggs*, 520 U. S. 833, 851–852 (1997) (relying upon the regulation to interpret the meaning of "assignment" and "alienation" in §1056(d)(1)). The Circuit treated Liv's waiver as an "'indirect arrangement'" whereby the Estate gained an "'interest enforceable against the plan.'" 497 F. 3d, at 430.

Casting the alienation net this far, though, raises questions that leave one in doubt. Although it is possible to speak of the waiver as an "arrangement" having the indirect effect of a transfer to the next possible beneficiary, it would be odd usage to speak of an estate as the transferee of its own decedent's property, just as it would be to speak of the decedent in his lifetime as his own transferee. And treating the estate or even the ultimate estate beneficiary as the assignee or transferee would be strange under the terms of the regulation: it would be hard to say the estate or future beneficiary "acquires" a right or interest when at the time of the waiver there was no estate and the beneficiary of a future estate might be anyone's guess. If there were a contingent beneficiary (or the participant made a

subsequent designation) the estate would get no interest; as for an estate beneficiary, the identity could ultimately turn on the law of intestacy applied to facts as yet unknown, or on the contents of the participant's subsequent will, or simply on the participant's future exercise of (or failure to invoke) the power to designate a new beneficiary directly under the terms of the plan. Thus, if such a waiver created an "arrangement" assigning or transferring anything under the statute, the assignor would be blindfolded, operating, at best, on the fringe of what "assignment" or "alienation" normally suggests.

The questionability of this broad reading is confirmed by exceptions to it that are apparent right off the bat. Take the case of a surviving spouse's interest in pension benefits, for example. Depending on the circumstances, a surviving spouse has a right to a survivor's annuity or to a lump-sum payment on the death of the participant, unless the spouse has waived the right and the participant has eliminated the survivor annuity benefit or designated a different beneficiary. See *Boggs*, *supra,* at 843; 29 U. S. C. §§1055(a), (b)(1)(C), (c)(2). This waiver by a spouse is plainly not barred by the antialienation provision. Likewise, DuPont concedes that a qualified disclaimer under the Tax Code, which allows a party to refuse an interest in property and thereby eliminate federal tax, would not violate the antialienation provision. See Brief for Respondents 21–23; 26 U. S. C. §2518. In each example, though, we fail to see how these waivers would be permissible under the Fifth Circuit's reading of the statute and regulation.

Our doubts, and the exceptions that call the Fifth Circuit's reading into question, point us toward authority we have drawn on before, the law of trusts that "serves as ERISA's backdrop." *Beck* v. *PACE Int'l Union*, 551 U. S. 96, 101 (2007). We explained before that §1056(d)(1) is much like a spendthrift trust provision barring assign-

ment or alienation of a benefit, see *Boggs*, *supra,* at 852, and the cognate trust law is highly suggestive here. Although the beneficiary of a spendthrift trust traditionally lacked the means to transfer his beneficial interest to anyone else, he did have the power to disclaim prior to accepting it, so long as the disclaimer made no attempt to direct the interest to a beneficiary in his stead. See 2 Restatement (Third) of Trusts §58(1), Comment *c,* p. 359 (2001) ("A designated beneficiary of a spendthrift trust is not required to accept or retain an interest prescribed by the terms of the trust. . . . On the other hand, a purported disclaimer by which the beneficiary attempts to direct who is to receive the interest is a precluded transfer"); E. Griswold, Spendthrift Trusts §524, p. 603 (2d ed. 1947) ("The American cases, though not entirely clear, generally take the view that the interest under a spendthrift trust may be disclaimed"); *Roseberry* v. *Moncure*, 245 Va. 436, 439, 429 S. E. 2d 4, 6 (1993) ("'If a trust is created without notice to the beneficiary or the beneficiary has not accepted the beneficial interest under the trust, he can disclaim'" (quoting 1 A. Scott & W. Fratcher, Law of Trusts §36.1, p. 389 (4th ed. 1987) (hereinafter Fratcher))).

We do not mean that the whole law of spendthrift trusts and disclaimers turns up in §1056(d)(1), but the general principle that a designated spendthrift can disclaim his trust interest magnifies the improbability that a statute written with an eye on the old law would effectively force a beneficiary to take an interest willy-nilly. Common sense and common law both say that "[t]he law certainly is not so absurd as to force a man to take an estate against his will." *Townson* v. *Tickell*, 3 Barn. & Ald. 31, 36, 106 Eng. Rep. 575, 576–577 (K. B. 1819).[6]

_____

[6] DuPont argues that Liv's waiver would have been an invalid disclaimer at common law because it was given for consideration in the divorce settlement. But the authorities DuPont cites fail to support the

The Treasury is certainly comfortable with the state of the old law, for the way it reads its own regulation "no party 'acquires from' a beneficiary a 'right or interest enforceable against the plan' pursuant to a beneficiary's waiver of rights where the beneficiary does not attempt to direct her interest in pension benefits to another person." Brief for United States as *Amicus Curiae* 18. And, being neither "plainly erroneous [n]or inconsistent with the regulation," the Treasury Department's interpretation of its regulation is controlling. *Auer* v. *Robbins*, 519 U. S. 452, 461 (1997).[7]

—————————

proposition that a beneficiary's otherwise valid disclaimer was invalid at common law because she received consideration. See *Roseberry* v. *Moncure*, 245 Va., at 439, 429 S. E. 2d, at 6; *Smith* v. *Bank of Del.*, 43 Del. Ch. 124, 126–127, 219 A. 2d 576, 577 (1966); *Preminger* v. *Union Bank & Trust Co.*, 54 Mich. App. 361, 368–369, 220 N. W. 2d 795, 798–799 (1974); 4 Fratcher §337.1 (4th ed. 1989); 1 Restatement (Second) of Trusts §36, Comment *c* (1957). It is true that the receipt of consideration prevents a beneficiary from making a qualified disclaimer for gift tax purposes, see 26 CFR §25.2518–2 (2008), and there is common law authority for the proposition that a renunciation by a devisee is ineffective against existing creditors if "it is shown that those who would take such property on renunciation had agreed to pay to the devisee something of value in consideration of such renunciation." 6 W. Bowe & D. Parker, Page on Law of Wills §49.5, p. 48 (2005); see also *Schoonover* v. *Osborne*, 193 Iowa 474, 478–479, 187 N. W. 20, 22 (1922). But at common law the receipt of consideration did not necessarily render a disclaimer invalid. See *Commerce Trust Co.* v. *Fast*, 396 S. W. 2d 683, 686–687 (Mo. 1965); *Central Nat. Bank* v. *Eells*, 5 Ohio Misc. 187, 189–192, 215 N. E. 2d 77, 80–81 (Ohio Prob. Ct. 1965); *In re Wimperis* [1914] 1 Ch. 502, 508–510; see also *In re Estate of Baird*, 131 Wash. 2d 514, 519, n. 5, 933 P. 2d 1031, 1034, n. 5 (1997). In any event, our point is not that Liv's waiver was a valid disclaimer at common law: only that reading the terms of 29 U. S. C. §1056(d)(1) to bar all non-QDRO waivers is unsound in light of background common law principles.

[7] It is true that the Government's position regarding the applicability of the antialienation provision to a waiver has fluctuated. The Labor Department previously took the position that "application of such a federal common-law waiver rule to pension plans would conflict with ERISA's anti-alienation provision." Brief for Secretary of Labor as

The Fifth Circuit found "significant support" for its contrary holding in the QDRO subsections, reasoning that "[i]n the marital-dissolution context, the QDRO provisions supply the *sole* exception to the anti-alienation provision," 497 F. 3d, at 430, a point that echoes in DuPont's argument here. But the negative implication of the QDRO language is not that simple. If a QDRO provided a way for a former spouse like Liv merely to waive benefits, this would be powerful evidence that the antialienation provision was meant to deny any effect to a waiver within a divorce decree but not a QDRO, else there would have been no need for the QDRO exception. But this is not so, and DuPont's argument rests on a false premise. In fact, a beneficiary seeking only to relinquish her right to benefits cannot do this by a QDRO, for a QDRO by definition requires that it be the "creat[ion] or recogni[tion of] the existence of an alternate payee's right to, or assign[ment] to an alternate payee [of] the right to, receive all or a portion of the benefits payable with respect to a participant under a plan." 29 U. S. C. §1056(d)(3)(B)(i)(I). There is no QDRO for a simple waiver; there must be some succeeding designation of an alternate payee.[8] Not being a

_____

*Amicus Curiae* 16 in *Keen* v. *Weaver*, No. 01–0447 (Tex. 2003). And it likewise asserted that "waiver of pension benefits is generally impermissible under [§1056(d)(1)]." Brief for Secretary of Labor as *Amicus Curiae* 5 in *In re Estate of Egelhoff*, No. 67626–7 (Wash. 2001). The Labor Department has reconsidered that view and has now taken the Treasury's position. Brief for United States as *Amicus Curiae* 20, n. 6. But "the change in interpretation alone presents no separate ground for disregarding the [Treasury's and the Labor] Department's present interpretation." *Long Island Care at Home, Ltd.* v. *Coke*, 551 U. S. 158, 171 (2007). Nor does the fact that the interpretation is stated in a legal brief make it unworthy of deference, as "[t]here is simply no reason to suspect that the interpretation does not reflect the agency's fair and considered judgment on the matter in question." *Auer*, 519 U. S., at 462.

[8] Even if one understands Liv's waiver to have resulted somehow in her interest reverting to William, he does not qualify as an "alternate

mechanism for simply renouncing a claim to benefits, then, the QDRO provisions shed no light on whether a beneficiary may waive by a non-QDRO.

In sum, Liv did not attempt to direct her interest in the SIP benefits to the Estate or any other potential beneficiary, and accordingly we think that the better view is that her waiver did not constitute an assignment or alienation rendered void under the terms of §1056(d)(1).

B

DuPont has three other reasons for saying that Liv's waiver was barred by ERISA. They are unavailing.

First, it argues that even if the waiver is not an assignment or alienation barred under the terms of §1056(d)(1), §1056(d)(3)(A) still prohibits it, in providing that §1056(d)(1) "shall apply to the creation, assignment, or recognition of a right to any benefit payable with respect to a participant pursuant to a domestic relations order [that is not a QDRO]." At the very least, DuPont reasons, Liv's waiver included a "recognition" of William's rights with respect to the SIP benefits. But DuPont overlooks the point that when subsection (d)(3)(A) provides that the bar to assignments or alienations extends to non-QDRO domestic relations orders, it does nothing to expand the scope of prohibited assignment and alienation under subsection (d)(1). Whether Liv's action is seen as a waiver or as a domestic relations order that incorporated a waiver, subsection (d)(1) does not cover it and §1056(d)(3)(A) does not independently bar it.

Second, DuPont relies upon §1056(d)(3)(H)(iii)(II), providing that if a domestic relations order is not a QDRO,

_____

payee," which is defined by statute as "any spouse, former spouse, child, or other dependent of a participant who is recognized by a domestic relations order as having a right to receive all, or a portion of, the benefits payable under a plan with respect to such participant." 29 U. S. C. §1056(d)(3)(K).

"the plan administrator shall pay the segregated amounts (including any interest thereon) to the person or persons who would have been entitled to such amounts if there had been no order." According to DuPont, because the divorce decree was not a QDRO this provision calls for paying benefits as if there had been no order. But DuPont has wrenched this language out of its setting, reading clause (iii) of subparagraph (H) as if there were no clause (i):

> "During any period in which the issue of whether a domestic relations order is a qualified domestic relations order is being determined . . . the plan administrator shall separately account for the amounts (hereinafter in this subparagraph referred to as the 'segregated amounts') which would have been payable to the alternate payee during such period if the order had been determined to be a qualified domestic relations order." §1056(d)(3)(H)(i).

Thus it is clear that subparagraph (H) speaks of a domestic relations order that distributes certain benefits (the "segregated amounts") to an alternate payee, when the question for the plan administrator is whether the order is effective as a QDRO. That is the circumstance in which, for want of a QDRO, clause (iii) tells the plan administrator not to pay the alternate, but to distribute the segregated amounts as if there had been no order. Clause (iii) does not, as DuPont suggests, state a general rule that a non-QDRO domestic relations order is a nullity in any proceeding that would affect the determination of a beneficiary. And of course clause (iii) says nothing here at all; the divorce decree names no alternate payee, and there are consequently no "segregated amounts."

Third, DuPont claims that a plan cannot recognize a waiver of benefits in a non-QDRO divorce decree because ERISA preempts "any and all State laws insofar as they

may now or hereafter relate to any employee benefit plan," with "State law" being defined to include "decisions" or "other State action having the effect of law."[9]  §§1144(a), (c)(1).  DuPont says that Liv's waiver, expressed in a state-court decision and related to an employee benefit plan, is thus preempted.  But recognizing a waiver in a divorce decree would not be giving effect to state law; the argument is that the waiver should be treated as a creature of federal common law, in which case its setting in a state divorce decree would be only happenstance.  A court would merely be applying federal law to a document that might also have independent significance under state law.  See, *e.g., Melton* v. *Melton*, 324 F. 3d 941, 945–946 (CA7 2003); *Clift* v. *Clift*, 210 F. 3d 268, 271–272 (CA5 2000); *Lyman Lumber Co.* v. *Hill*, 877 F. 2d 692, 693–694 (CA8 1989).

### III

The waiver's escape from inevitable nullity under the express terms of the antialienation clause does not, however, control the decision of this case, and the question remains whether the plan administrator was required to honor Liv's waiver with the consequence of distributing the SIP balance to the Estate.[10]  We hold that it was not,

---

[9]This preemption provision does not apply to QDROs.  See §1144(b)(7).

[10]Despite our following answer to the question here, our conclusion that §1056(d)(1) does not make a nullity of a waiver leaves open any questions about a waiver's effect in circumstances in which it is consistent with plan documents.  Nor do we express any view as to whether the Estate could have brought an action in state or federal court against Liv to obtain the benefits after they were distributed.  Compare *Boggs* v. *Boggs,* 520 U. S. 833, 853 (1997) ("If state law is not preempted, the diversion of retirement benefits will occur regardless of whether the interest in the pension plan is enforced against the plan or the recipient of the pension benefit"), with *Sweebe* v. *Sweebe*, 474 Mich. 151, 156–159, 712 N. W. 2d 708, 712–713 (2006) (distinguishing *Boggs* and holding that "while a plan administrator must pay benefits to the named beneficiary as required by ERISA," after the benefits are dis-

and that the plan administrator did its statutory ERISA duty by paying the benefits to Liv in conformity with the plan documents.

ERISA requires "[e]very employee benefit plan [to] be established and maintained pursuant to a written instrument," 29 U. S. C. §1102(a)(1), "specify[ing] the basis on which payments are made to and from the plan," §1102(b)(4). The plan administrator is obliged to act "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of [Title I] and [Title IV] of [ERISA]," §1104(a)(1)(D), and the Act provides no exemption from this duty when it comes time to pay benefits. On the contrary, §1132(a)(1)(B) (which the Estate happens to invoke against DuPont here) reinforces the directive, with its provision that a participant or beneficiary may bring a cause of action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."

The Estate's claim therefore stands or falls by "the terms of the plan," §1132(a)(1)(B), a straightforward rule of hewing to the directives of the plan documents that lets employers "'establish a uniform administrative scheme, [with] a set of standard procedures to guide processing of claims and disbursement of benefits.'"[11] *Egelhoff* v. *Egel-*

---

tributed "the consensual terms of a prior contractual agreement may prevent the named beneficiary from retaining those proceeds"); *Pardee* v. *Pardee*, 2005 OK CIV APP. 27, ¶¶20, 27, 112 P. 3d 308, 313–314, 315–316 (2004) (distinguishing *Boggs* and holding that ERISA did not preempt enforcement of allocation of ERISA benefits in state-court divorce decree as "the pension plan funds were no longer entitled to ERISA protection once the plan funds were distributed").

[11] We express no view regarding the ability of a participant or beneficiary to bring a cause of action under 29 U. S. C. §1132(a)(1)(B) where the terms of the plan fail to conform to the requirements of ERISA and the party seeks to recover under the terms of the statute.

*hoff*, 532 U. S. 141, 148 (2001) (quoting *Fort Halifax Packing Co.* v. *Coyne*, 482 U. S. 1, 9 (1987)); see also *Curtiss-Wright Corp.* v. *Schoonejongen*, 514 U. S. 73, 83 (1995) (ERISA's statutory scheme "is built around reliance on the face of written plan documents"). The point is that by giving a plan participant a clear set of instructions for making his own instructions clear, ERISA forecloses any justification for enquiries into nice expressions of intent, in favor of the virtues of adhering to an uncomplicated rule: "simple administration, avoid[ing] double liability, and ensur[ing] that beneficiaries get what's coming quickly, without the folderol essential under less-certain rules." *Fox Valley & Vicinity Const. Workers Pension Fund* v. *Brown*, 897 F. 2d 275, 283 (CA7 1990) (Easterbrook, J., dissenting).

And the cost of less certain rules would be too plain. Plan administrators would be forced "to examine a multitude of external documents that might purport to affect the dispensation of benefits," *Altobelli* v. *IBM Corp.*, 77 F. 3d 78, 82–83 (CA4 1996) (Wilkinson, C. J., dissenting), and be drawn into litigation like this over the meaning and enforceability of purported waivers. The Estate's suggestion that a plan administrator could resolve these sorts of disputes through interpleader actions merely restates the problem with the Estate's position: it would destroy a plan administrator's ability to look at the plan documents and records conforming to them to get clear distribution instructions, without going into court.

The Estate of course is right that this guarantee of simplicity is not absolute. The very enforceability of QDROs means that sometimes a plan administrator must look for the beneficiaries outside plan documents notwithstanding §1104(a)(1)(D); §1056(d)(3)(J) provides that a "person who is an alternate payee under a [QDRO] shall be considered for purposes of any provision of [ERISA] a beneficiary under the plan." But this in effect means that

a plan administrator who enforces a QDRO must be said
to enforce plan documents, not ignore them. In any case, a
QDRO enquiry is relatively discrete, given the specific and
objective criteria for a domestic relations order that quali-
fies as a QDRO,[12] see §§1056(d)(3)(C), (D), requirements
that amount to a statutory checklist working to "spare [an
administrator] from litigation-fomenting ambiguities,"
*Metropolitan Life Ins. Co.* v. *Wheaton*, 42 F. 3d 1080, 1084
(CA7 1994). This is a far cry from asking a plan adminis-
trator to figure out whether a claimed federal common law
waiver was knowing and voluntary, whether its language
addressed the particular benefits at issue, and so forth, on
into factually complex and subjective determinations. See,
*e.g., Altobelli, supra,* at 83 (Wilkinson, C. J., dissenting)
("[W]aiver provisions are often sweeping in their terms,
leaving their precise effect on plan benefits unclear");
*Mohamed* v. *Kerr*, 53 F. 3d 911, 915 (CA8 1995) (making
"fact-driven determination" that marriage termination
agreement constituted a valid waiver under federal com-
mon law).

These are good and sufficient reasons for holding the
line, just as we have done in cases of state laws that might

---

[12] To qualify as a QDRO, a divorce decree must "clearly specif[y]" the
name and last known mailing address of the participant and the name
and mailing address of each alternate payee covered by the order; the
amount or percentage of the participant's benefits to be paid by the
plan to each such alternate payee or the manner in which such amount
or percentage is to be determined; the number of payments or period to
which the order applies; and each plan to which such order applies.
§1056(d)(3)(C). A domestic relations order cannot qualify as a QDRO if
it requires a plan to provide any type or form of benefit, or any option,
not otherwise provided under the plan; requires the plan to provide
increased benefits; or requires the payment of benefits to an alternate
payee that are required to be paid to another alternate payee under
another order previously determined to be a QDRO. §1056(d)(3)(D). A
plan is required to establish written procedures for determining
whether a domestic relations order is a QDRO. §1056(d)(3)(G)(ii).

blur the bright-line requirement to follow plan documents in distributing benefits. Two recent preemption cases are instructive here. *Boggs* v. *Boggs*, 520 U. S. 833, held that ERISA preempted a state law permitting the testamentary transfer of a nonparticipant spouse's community property interest in undistributed pension plan benefits. We rejected the entreaty to create "through case law . . . a new class of persons for whom plan assets are to be held and administered," explaining that "[t]he statute is not amenable to this sweeping extratextual extension." *Id.*, at 850. And in *Egelhoff* we held that ERISA preempted a state law providing that the designation of a spouse as the beneficiary of a nonprobate asset is revoked automatically upon divorce. 532 U. S., at 143. We said the law was at fault for standing in the way of making payments "simply by identifying the beneficiary specified by the plan documents," *id.*, at 148, and thus for purporting to "undermine the congressional goal of 'minimiz[ing] the administrative and financial burden[s]' on plan administrators," *id.*, at 149–150 (quoting *Ingersoll-Rand Co.* v. *McClendon*, 498 U. S. 133, 142 (1990)); see *Egelhoff*, *supra*, at 147, n. 1 (identifying "the conflict between the plan documents (which require making payments to the named beneficiary) and the statute (which requires making payments to someone else)").

What goes for inconsistent state law goes for a federal common law of waiver that might obscure a plan administrator's duty to act "in accordance with the documents and instruments." See *Mertens* v. *Hewitt Associates*, 508 U. S. 248, 259 (1993) ("The authority of courts to develop a 'federal common law' under ERISA . . . is not the authority to revise the text of the statute"). And this case does as well as any other in pointing out the wisdom of protecting the plan documents rule. Under the terms of the SIP Liv was William's designated beneficiary. The plan provided an easy way for William to change the designation, but for

whatever reason he did not. The plan provided a way to disclaim an interest in the SIP account, but Liv did not purport to follow it.[13]  The plan administrator therefore did exactly what §1104(a)(1)(D) required: "the documents control, and those name [the ex-wife]."  *McMillan* v. *Parrott*, 913 F. 2d 310, 312 (CA6 1990).

It is no answer, as the Estate argues, that William's beneficiary-designation form should not control because it is not one of the "documents and instruments governing the plan" under §1104(a)(1)(D) and was not treated as a plan document by the plan administrator. That is beside the point. It is uncontested that the SIP and the summary plan description are "documents and instruments governing the plan." See *Curtiss-Wright Corp.*, 514 U. S., at 84 (explaining that 29 U. S. C. §§1024(b)(2) and (b)(4) require a plan administrator to make available the "governing plan documents"). Those documents provide that the plan administrator will pay benefits to a participant's designated beneficiary, with designations and changes to be made in a particular way. William's designation of Liv as his beneficiary was made in the way required; Liv's waiver was not.[14]

## IV

Although Liv's waiver was not rendered a nullity by the terms of §1056, the plan administrator properly distrib-

_____

[13] The Estate does not contend that Liv's waiver was a valid disclaimer under the terms of the plan. We do not address a situation in which the plan documents provide no means for a beneficiary to renounce an interest in benefits.

[14] The Estate also contends that requiring a plan administrator to distribute benefits in conformity with plan documents will allow a beneficiary who murders a participant to obtain benefits under the terms of the plan. The "slayer" case is not before us, and we do not address it. See *Egelhoff* v. *Egelhoff*, 532 U. S. 141, 152 (2001) (declining to decide whether ERISA preempts state statutes forbidding a murdering heir from receiving property as a result of the killing).

uted the SIP benefits to Liv in accordance with the plan documents. The judgment of the Court of Appeals is affirmed on the latter ground.

*It is so ordered.*