**[J-45-2020]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | |
|---|---|
| ESTATE OF MICHAEL A. BENYO AND JEFFREY BENYO, INDIVIDUALLY, | : No. 90 MAP 2019 |
| | : |
| | : Appeal from the Order of the |
| Appellees | : Superior Court at No. 324 EDA |
| | : 2017 dated May 13, 2019 Affirming |
| | : the Verdict of the Chester County |
| v. | : Court of Common Pleas, Civil |
| | : Division, at No. 2013-08348-CT, |
| | : Vacating the judgment entered April |
| SCOTT F. BREIDENBACH, ESQ., | : 18, 2018 and remanding with |
| REPRESENTATIVE OF THE ESTATE OF | : instructions. |
| MARSHA BENYO, | : |
| | : ARGUED: May 19, 2020 |
| Appellant | : |

**OPINION**

**JUSTICE WECHT**                                                    **DECIDED: July 21, 2020**

In an issue of first impression, the Superior Court held that anti-alienation

provisions governing municipal pensions found in various statutes[1] protected assets from

attachment and other legal process (including a contract claim) only while those assets

remained in the possession of the pension fund administrator. Specifically, the Superior

Court determined that a spouse's promise to waive her right to her husband's pension

benefits, including agreeing to transfer such benefits after receiving them from the

administrator, was legally enforceable. Because the Superior Court's interpretation is

---

[1]     *See* Police Pension Fund Law ("PPFL"), 53 P.S. §§ 761-66; Municipal Police
Pension Law ("MPPL"), 53 P.S. §§ 767-78; Pennsylvania Municipal Retirement Law
("PMRL"), 53 P.S. §§ 881.101-881.501

consistent with the plain language of the statutes, the context in which the provisions appear, and Pennsylvania precedent interpreting similar statutory language, we affirm the decision of the Superior Court.

## I. Background

Marsha Benyo ("Marsha") and Michael Benyo ("Michael") married in 1989. Michael served as a police officer for the North Coventry Township Police Department, entitling him to a municipal pension benefit. When Michael retired in 2010, he selected the joint annuity benefits option and provided that Marsha would be his joint annuitant.[2] Under this plan, Michael would receive $2,137.99 per month for the rest of his life, and, in the event that Michael predeceased Marsha, she would continue to receive the same amount for the remainder of her life.[3] Because the Pennsylvania Municipal Retirement System ("PMRS") calculated the monthly benefits using a formula that accounted for the life expectancies of both beneficiaries, Michael's selection of Marsha as his joint annuitant could not be revoked.[4] As Michael did not contribute to the plan himself, his designated beneficiary would receive no death benefit.[5]

On May 21, 2012, Michael filed for divorce. On June 18, 2012, Michael and Marsha executed a property settlement agreement to divide their property. This agreement provided, in relevant part:

---

[2] *See* Trial Court Exhibit D5 (Sean Christine Deposition), Christine Deposition Exhibit 3 (Certificate of Benefits for Michael Benyo).

[3] *See id.*

[4] *See* 53 P.S. § 881.115(a) ("The retirement allowance and the contributions of members to the fund . . . shall be unassignable except to a beneficiary."); *see also* Notes of Testimony ("N.T."), 2/8/2016, at 160 (testimony of Sean Christine, Chief of Membership Services at PMRS) (calling the selection of a survivor annuitant "irrevocable").

[5] *See* N.T. at 159-60.

Wife will agree to waive all right, title and interest in Husband's Police Pension. Wife will sign any necessary paperwork upon demand to facilitate said waiver. In addition, Wife agrees to waive any death benefit from Husband's Pension. She will sign any necessary paperwork to facilitate said waiver. At the time of the signing of this Agreement, Wife is to receive a one hundred percent (100%) death benefit. If the Plan Administrator of said Pension will not permit a waiver of said death benefit to Wife or a change of beneficiary based on Wife's life expectancy, Wife will agree to sign any necessary paperwork, including a statement in writing that she waives the benefits and instructs her estate to make payment of any benefits it may receive to a beneficiary designated by Husband. As of the date of the signing of this Agreement, the designated beneficiary of the death benefit will be Jeffrey Benyo[6] . . . . Unless Wife receives a written statement from Husband that the designated beneficiary has changed, any proceeds that she or her estate receives shall be paid to Jeffrey Benyo. It is understood that, if Wife fails to fulfill the obligation set forth in the Agreement, Jeffrey Benyo and/or the estate of Michael Benyo may pursue all claims he or the estate may have against Wife and may seek appropriate sanctions including but not limited to counsel fees.

Currently Husband is receiving monthly payments from his Police Pension. The aforesaid benefits were used for the benefit of both parties. As a result, Wife agrees to reimburse Husband for fifty percent (50%) of the net proceeds he received since October 2010. Said reimbursement shall be performed on or before June 30, 2012. As of June 30, 2012, said reimbursement will be Seventeen Thousand Eight Hundred Twenty Dollars ($17,820).

Trial Court Exhibit P1 (Property Settlement Agreement) ("PSA") at 8-9. Michael and Marsha both signed the PSA. *See id.* at 11; *see also id.* at 3 ("Each party had an opportunity to review this agreement and the legal effects with an attorney."). Both agreed that "the parties will execute any and all written instruments, assignments, releases, satisfactions, deeds, notes or other writings as may be reasonably necessary and desirable for the proper effectuation of" the PSA. *Id.* at 5. In the event either party breached the PSA, "the other party [would] have the right to sue for damages for such breach," including the right to attorneys' fees. *Id.* at 10-11. Finally, "the date of execution" of the PSA was "defined as the date upon which it is executed by the parties," though the

---

6    Jeffrey Benyo ("Jeffrey") is Michael's brother.

PSA was to be "incorporated into any divorce decree which may be entered with respect to the parties." *Id.* at 2.

Following execution of the PSA, and Marsha's waiver of her right to Michael's pension benefits, Marsha and Michael began to divide the balance of their remaining property and continued their divorce proceedings. On October 2, 2012, a praecipe to transmit the record to the court for entry of the divorce decree was filed. But in an order dated October 31, 2012, the trial court indicated that it would not enter the decree because Michael improperly served the divorce complaint. The next day, the trial court notified the parties that they had to file a new praecipe.

Michael died on November 2, 2012, before he served a new divorce complaint. Michael's Estate asked PMRS to begin paying Michael's pension benefits to Jeffrey. However, in an August 1, 2013 letter, PMRS informed the Estate that Marsha did "not have any further rights of assignment." Trial Court Exhibit D5 (Sean Christine Deposition), Christine Deposition Exhibit 6 (PMRS Letter to Michael's Estate, 8/1/2013) ("PMRS Letter"), at 1. PMRS determined that the PSA, to the extent that it required PMRS to begin making payments to Jeffrey, was "not in compliance with Pennsylvania Municipal Retirement Law; and, whereas the PMRS has not received anything in writing from Marsha Benyo instructing [PMRS] to stop payments, . . . Marsha Benyo . . . is the rightful recipient of Michael Benyo's pension benefit and shall be paid accordingly." *Id.* at 2. However, PMRS further stated that, if Marsha "were to enter into an agreement whereby she redistributes monies after being paid by PMRS, that is outside the scope of this agency's purview and would not affect our contractual obligation to pay her the entitled joint annuity benefit." *Id.* at 1.

Marsha continued to refuse to transfer the pension benefits to the Estate or to Jeffrey, and the Estate and Jeffrey together (collectively, the "Estate") brought suit in the

Chester County Court of Common Pleas. The cover sheet accompanying the original complaint noted that the Estate was filing a contract suit for a "[b]reach of a post-nuptial agreement." Complaint, No. 13-08348, Cover Sheet. Both the original complaint, *id.* at ¶¶ 18-22, and the amended complaint, Amended Complaint, No. 13-08348, at ¶¶ 18-22, included a count for breach of contract. The Estate conceded that, pursuant to PMRS' determination, "[u]nder Pennsylvania law, a police pension cannot be assigned directly through the plan administrator so payments could be made directly to Jeffrey Benyo." *Id.* at ¶ 7. However, the Estate averred, "there is no law that precludes any beneficiary assigning the benefits to a third party upon receipt." *Id.* Marsha filed an answer to the amended complaint, arguing, among other things, that "[a]ny provisions of the" PSA "relating to pension and/or death benefits of Michael Benyo are invalid as violative of applicable federal and state law, including the Pa. Municipal Retirement Law (PMRL)." Answer, New Matter and Counterclaim, No. 13-08348, New Matter at ¶ 7.

The court of common pleas conducted a non-jury trial. PMRS membership chief Sean Christine testified that Michael could not have changed the beneficiary of the survivor annuity. *See* N.T. at 160-61. Christine also explained that Marsha could not request that PMRS send the payments directly to another individual. *Id.* at 169, 172-73. On cross examination, the Estate's attorney asked Christine, "[D]oes [PMRS] have any restrictions regarding Mrs. Benyo's use of the monies or transfer of the monies?" *Id.* at 178. Christine answered, "No, it does not," adding later that "it's similar to having your employer paying you. The employer pays you, and what you do with the money afterwards is your business." *Id.*; *see also id.* at 184. Christine also responded affirmatively when asked whether the "survivor benefit" was a "pension benefit," indicating that he used the terms "interchangeably." *Id.* at 179-180; *see also id.* at 180 (stating that

the phrases "pension benefit" and "survivor benefit" are "unique, but . . . interchangeable in a sense").

On July 21, 2016, the trial court entered a verdict in favor of the Estate. The court concluded that Marsha and Michael "entered into a valid" PSA. Trial Court Order, No. 13-08348, 7/21/2016, at 1 n.2. Pursuant to that PSA, the trial court found that Marsha "renounced any entitlement she may have to [Michael's] police pension in whatever form it may take, including the death benefit." *Id.* According to the trial court, Marsha "breached the express terms of the [PSA] by retaining and failing to remit to the Estate . . . the $2,137.99 monthly payment received from November 2012 to May 31, 2016." *Id.* at 1-2 n.2. The trial court ordered that Marsha transfer to the Estate those past payments and transfer future payments that were to be deposited into Marsha's account. *Id.* at 2-3. In its order, the trial court did not remark upon Marsha's claim that the PSA violated federal and state statutes. After Marsha filed post-trial motions and declared bankruptcy, she too passed away. Scott Breidenbach, Esquire, was appointed as personal representative of Marsha's Estate ("Breidenbach").[7]

The Superior Court affirmed. *Estate of Benyo v. Breidenbach*, 324 EDA 2017, 2019 WL 2094264 (Pa. Super. May 13, 2019). The court first found that PSAs "are enforceable at law or equity," *id.* at *5, and that the trial court had personal jurisdiction over Marsha and subject matter jurisdiction over the case, *id.* at *6-8.

Interpreting the PSA, the court posited that the document's plain language and "parties' clear and unambiguous intent was for [Marsha] to give up all of her rights to receive money from PMRS in any form." *Id.* at *9. The court further concluded that Marsha and Michael "contemplated" that, if PMRS would be unable to change the

---

[7] To prevent confusion and to mirror the caption of the case, we continue to refer to Michael's estate (and Jeffrey) as the "Estate," and we refer to Marsha's estate as "Breidenbach."

beneficiary, then Marsha would "'agree to sign any paperwork, including a statement in writing that she waives the benefits and instructs her estate to make payments of **any benefits** it may receive to a beneficiary designated by'" Michael. *Id.* (quoting the PSA at 8) (Superior Court's emphasis). The court also construed the language of the PSA to include all benefits relating to Michael's pension, rejecting Breidenbach's argument that "the survivor annuity was not included in [Marsha's] waiver of benefits," because that interpretation "utterly ignore[d]" the language of the PSA, "as well as her agreement that 'any proceeds that she or her estate receives shall be paid to Jeffrey Benyo.'" *Id.* (quoting the PSA at 8).

Breidenbach averred that 53 P.S. § 776, part of the MPPL,[8] and 53 P.S. § 881.115(a), part of the PMRL,[9] "prohibit[ed] the assignment of [Marsha's] interest in the survivor annuity to a third party, and prohibit[ed] the use of any legal process to require their transfer to a third party." *Id.* at *10. According to Breidenbach, "the court could not circumvent the law by ordering [Marsha] to transfer the funds to Jeffrey Benyo after they were paid to her by PMRS." *Id.* But the court rejected this argument as "contrary to relevant precedent." The court invoked its decision in *Commonwealth v. Mooney*, 92 A.2d 258 (Pa. Super. 1952), where it concluded that: "although a court could not require the police pension fund to distribute funds to someone other than a beneficiary, the funds were 'attachable in the hands of the delinquent husband, when received by him[,] and

---

[8]    *See supra* n.1. "The pension payments, herein provided for, shall not be subject to attachment, execution, levy, garnishment or other legal process, and shall be payable only to the member or his designated beneficiary and shall not be subject to assignment or transfer." 53 P.S. § 776.

[9]    *See supra* n.1. "The retirement allowance and the contributions of members to the fund, all contributions returned to contributors under the provisions of this act and the moneys in the fund created by this act, shall be exempt from any State or municipal tax and shall be unassignable except to a beneficiary." 53 P.S. § 881.115(a).

proceedings may be directed against him personally for failure to pay support though his only resources are derived from such payments.'" *Estate of Benyo*, 2019 WL 2094264, at *10 (quoting *Mooney*, 92 A.2d at 260). As in *Mooney*, the court observed, the trial court did not order PMRS to make payments to Jeffrey, but rather ordered Marsha to do so.

Finally, the Superior Court compared the case to its recent decision in *In re Estate of Easterday*, 171 A.3d 911 (Pa. Super. 2017).[10] In *Easterday*, that court had found that, although the federal Employee Retirement Income Security Act ("ERISA"), Pub. L. No. 93-406, 88 Stat. 829 (codified at 29 U.S.C. §§ 1001, *et seq.*), did not allow a court "to require the retirement plan administrators to directly pay funds to a third party, it could enforce the parties' property settlement agreement by ordering the wife to turn over to the husband's estate all proceeds she had received, as well as any future proceeds she was entitled to receive." *Estate of Benyo*, 2019 WL 2094264, at *11.

The Superior Court proceeded to vacate the judgment and remand the case to the trial court for further proceedings tailored to reflect Marsha's intervening bankruptcy and death. The panel instructed the trial court "to calculate the full and final monetary relief due to [the Estate] and to enter judgment against [Breidenbach] for that amount." *Id.*

We granted *allocatur*, limited to the following question:

> Whether, similar to *In re: Estate of Easterday*, 171 A.3d 911 (Pa. Super. 2017), *affirmed* 209 A.3d 331 (Pa. 2019), a Superior Court affirmed order requiring a beneficiary to "transfer" ERISA-exempt pension payments received from the plan administrator of the Pa. Municipal Police Pension Law (hereafter MPPL) to the estate of the late spouse violates the MPPL's anti-alienation provisions, when the MPPL specifically prohibits "transfer" of its payments and further prohibits the payments from being subject to "legal process" thereby being a case of first impression and of such public (and governmental) importance as to require Supreme Court action?

---

[10] After the panel's decision in this case, we affirmed the Superior Court's decision in *Easterday*. *In re Estate of Easterday*, 209 A.3d 331 (Pa. 2019).

*Estate of Benyo v. Breidenbach*, 220 A.3d 1062 (Pa. 2019) (*per curiam*).[11]

## II. Analysis

Breidenbach argues that Section 764 of the PPFL,[12] Section 776 of the MPPL, and Section 881.115(a) of the PMRL prohibit enforcement of the PSA to the extent that Marsha agreed to transfer the survivor annuity benefits once PMRS deposited them into her personal account. "This issue presents a question of law, for which our standard of review is *de novo* and our scope of review is plenary." *Thompson v. Thompson*, 223 A.3d 1272, 1277 (Pa. 2020).

Last year, in *Easterday*, this Court confronted a similar factual scenario, where divorcing spouses agreed to waive their rights to each other's pension benefits through a PSA. *Easterday*, 209 A.3d at 333. When one party refused to transfer her spouse's pension benefits, we considered whether ERISA preempted enforcement of the PSA. Although *Easterday* was an appeal from an orphans' court proceeding adjudicating the underlying divorce, we wrote that "[p]roperty settlement agreements are contracts and as such are construed in accordance with the principles of our Commonwealth's contract

---

[11] In his petition for allowance of appeal, Breidenbach also asked this Court to grant *allocatur* on a question involving personal and subject matter jurisdiction. *See* Petition for Allowance of Appeal, 334 MAL 2019, at 5, 11-16. Although we granted *allocatur* on the statutory interpretation question, we specifically noted that "[a]llocatur is **DENIED** as to all remaining issues." *Estate of Benyo*, 220 A.3d at 1062 (emphasis in original). Notwithstanding this clear instruction, Breidenbach again raises jurisdictional questions in his brief to this Court. *See* Brief for Appellant at 11, 14-15. We have no reason to question the jurisdictional rulings of the lower courts, and we expressly declined to consider the matter further. Breidenbach also renews his argument that, per the PSA, Marsha agreed to transfer the death benefits of Michael's pension only, which Breidenbach distinguishes from the survivor annuity. Brief for Appellant at 16-19. Breidenbach did not even ask that this Court grant *allocatur* on this question. We will not consider it further and, similar to the lower courts' jurisdictional rulings, we do not question their interpretation of the language of the PSA.

[12] *See supra* n.1. "The retirement allowance herein provided for shall be payable only to the beneficiary designated by this act and shall not be subject to assignment or transfer." 53 P.S. § 764.

law." *Id.* at 346. Relying upon precedent from the Supreme Court of the United States and the United States Court of Appeals for the Third Circuit, we noted that ERISA had two primary purposes: "(1) the establishment of uniform and efficient plan administration, and (2) protection against double liability for administrators." *Id.* at 345 (citing *Kennedy v. Plan Adm'r for DuPont Sav. & Inv. Plan*, 555 U.S. 285 (2009), and *Estate of Kensinger v. URL Pharma, Inc.*, 674 F.3d 131 (3d Cir. 2012)). Because it was "clear that none of [ERISA's] articulated objectives . . . are implicated when an estate attempts to recover benefits that have already been distributed," we found that ERISA did not preempt the state contract claim and that the PSA was enforceable. *Id.* at 346.

The parties agree that *Easterday* does not govern this case, *see* Brief for Appellant at 4; Brief for Appellees at 3-4, because ERISA does "not apply to any employee benefit plan if . . . such plan is a governmental plan," like Michael's municipal police pension. 29 U.S.C. § 1003(b)(1). Thus, in an issue of first impression, we must decide whether Pennsylvania state law requires a different result than ERISA does under similar circumstances, rendering unenforceable the relevant provisions of the PSA at issue in this case.

Section 764, which relates to police pension funds, provides that "[t]he retirement allowance herein provided for shall be payable only to the beneficiary designated by this act and shall not be subject to assignment or transfer." 53 P.S. § 764. Section 776, which is a part of the MPPL, 53 P.S. §§ 767-78, similarly states that "[t]he pension payments, herein provided for, shall not be subject to attachment, execution, levy, garnishment or other legal process, and shall be payable only to the member or his designated beneficiary and shall not be subject to assignment or transfer." 53 P.S. § 776. Finally, Section 881.115(a) of the PMRL, which governs all municipal pensions, police or otherwise, contains parallel language: "The retirement allowance and the contributions

of members to the fund, all contributions returned to contributors under the provisions of this act and the moneys in the fund created by this act, . . . shall be unassignable except to a beneficiary." 53 P.S. § 881.115(a). Although the three provisions employ slightly different language, one question unites their application to this case: whether Sections 764, 776, and 881.115(a) protect benefits from various legal processes only when in the hands of the plan administrator, or whether the anti-alienation protections of those provisions extend to those benefits even after disbursement to the beneficiary.

"In all matters involving statutory interpretation, we apply the Statutory Construction Act, 1 Pa.C.S. §§ 1501, *et seq.*, which directs us to ascertain and effectuate the intent of the General Assembly." *Dep't of Labor & Indus. v. W.C.A.B. (Lin & Eastern Taste)*, 187 A.3d 914, 922 (Pa. 2018) (internal quotation marks and citation omitted). "In discerning that intent, the [C]ourt first resorts to the language of the statute itself. If the language of the statute clearly and unambiguously sets forth the legislative intent, it is the duty of the court to apply that intent to the case at hand and not look beyond the statutory language to ascertain its meaning." *Id.* (internal quotation marks and citation omitted); *accord* 1 Pa.C.S. § 1921(b) ("When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit.").

Based upon the unambiguous language of Sections 764, 776, and 881.115(a), we find that those provisions apply only to pension funds that remain in the possession of the plan administrator. Those provisions have no bearing upon, and do not prohibit enforcement of, a contract directing the disposition or transfer of those funds once the designated beneficiary receives them.

Breidenbach argues that the provisions "are written from the perspective of the object – the 'pension payment', 'retirement allowance', [and] 'monies [*sic*] in the fund,'" implying that the statutes protect the funds from legal process even after disbursement.

Brief for Appellant at 9 (citations omitted). To the contrary, the statutory language contemplates protection of those benefits only when in the hands of the pension administrators. In Section 764, the General Assembly provided that "[t]he retirement allowance herein provided for *shall be payable only to the beneficiary* . . . ." 53 P.S. § 764 (emphasis added). The use of the word "payable," in particular, signals the statute's focus upon the process of the pension administrator's payment to the beneficiary. Nothing in the statutory language clearly controls the disposition of the funds after their disbursement to the beneficiary. Section 776 uses the phrase "shall be *payable* only to the member or his designated beneficiary" to similar effect. *Id.* § 776 (emphasis added). While the first clause in Section 776 employs broader language than Section 764, *see id.* ("The pension payments . . . shall not be subject to attachment, execution, levy, garnishment or other legal process . . . ."), the phrase "pension *payments*" further evinces the statute's application only to the disposition of the funds while in possession of the administrator. Only the administrator makes a "payment" to the beneficiary. But correlatively, the administrator *only* makes a payment to the beneficiary. Once that task is completed, once payment is made to a proper beneficiary, what happens next is not the statute's concern. The payment, as such, has been made. Finally, Section 881.115(a)'s employment of "moneys *in the fund,*" *id.* § 881.115(a) (emphasis added), leads to the same conclusion. Only the pension plan administrator administers the "fund." When the administrator transfers the money from that fund to the beneficiary, the money no longer resides in the fund and is not protected by Section 881.115(a).

Viewing the provisions at issue in their context only reinforces our interpretation. We interpret statutory language "not in isolation, but in the context in which it appears." *Commonwealth by Shapiro v. Golden Gate Nat'l Senior Care LLC*, 194 A.3d 1010, 1027 (Pa. 2018). The General Assembly enacted Section 764 in 1893 with a number of other

provisions as a part of the PPFL. *See* Act of May 24, 1893, Pub. L. 129, No. 82 (codified as amended at 53 P.S. §§ 761-64). Other provisions of the PPFL regulate the *administration* of police pension payments. *See* 53 P.S. §§ 761 ("Establishment; regulations"), 762 ("Gifts in trust may be accepted; management of fund"). The General Assembly passed Section 776 as a part of the MPPL, Act of May 29, 1956, Pub. L. 1804, No. 600 (codified as amended at 53 P.S. §§ 767-78). Like the PPFL, the MPPL also has many provisions that deal with *administration* of the pension benefits. *See, e.g.*, 53 P.S. §§ 767 ("Establishment of police pension funds or pension annuities; regulation and maintenance; rights of beneficiaries"), 768 ("Gifts; management"), 777 ("Expense of administration"). Finally, the PMRL, of which Section 881.115(a) is a part, has numerous provisions regulating how PMRS manages and regulates municipal pension benefits. *See, e.g.*, *id.* §§ 881.110 ("Management and investment of fund; interest credits"), 881.112 ("Annual estimates to municipalities; administrative expenses").

Based upon the plain text of the statutory provisions, as well as the context in which that text appears, we agree with the Estate that "the characteristics" of ERISA and these provisions "go hand in hand." Brief for Appellees at 4. Although the outcome in this case is not dictated by ERISA, we find that the three provisions in question, like ERISA's similar provisions, serve "the establishment of uniform and efficient plan administration." *Easterday*, 209 A.3d at 345 (citing *Kensinger*, 674 F.3d at 135). The General Assembly intended that the three anti-alienation provisions ensure that PMRS is able to administer the pension funds and disburse payments with the "virtues of adhering to an uncomplicated rule: 'simple administration . . . and ensur[ing] that beneficiaries get what's coming quickly, without the folderol essential under less-certain rules.'" *Kennedy*, 555 U.S. at 301 (quoting *Fox Valley & Vicinity Constr. Workers Pension Fund v. Brown*, 897 F.2d 275, 283 (7th Cir. 1990) (Easterbrook, J., dissenting)). Because it is "clear that none

of the articulated objectives" of Sections 764, 776, and 881.115(a) "are implicated when an estate attempts to recover benefits that have already been distributed," *Easterday*, 209 A.3d at 346, it is equally clear that they do not prohibit enforcement of the PSA, insofar as the PSA requires the transfer of funds already disbursed.

The interpretation we adopt today accords with how Pennsylvania courts have interpreted similar Pennsylvania statutes in the past. For example, in *Commonwealth v. Mooney*, the Superior Court ruled that a statute with language similar to Section 776 precluded a court from attaching a police pension pursuant to a support order when those funds were still in the hands of the pension administrator. *Mooney*, 92 A.2d at 260. But, the court noted, "[t]he funds are attachable in the hands of the delinquent husband, when received by him and proceedings may be directed against him personally for failure to pay support though his only resources are derived from such payments." *Id.*; *accord Commonwealth ex rel. Cerminara v. Cerminara*, 362 A.2d 1011, 1017 (Pa. Super. 1976);[13] *see also Dutton v. Berry*, 33 Pa D. & C. 5th 321, 2013 WL 10257629, at *3 (C.C.P. Phila. 2013) ("Once the child support proceeds are deposited into Appellant's checking account, they become commingled with other money that Appellant deposits into the same account, losing their separate identity as child support, such as more water into a glass."); *cf. In re McGreevy's Estate*, 286 A.2d 355, 356 (Pa. 1971) (interpreting a federal statute and stating that "'[t]he weight of authority sustains the proposition that, when the transmission of pension money is ended, and the pensioner or his guardian has

---

[13] This Court later would abrogate *Mooney* and *Cerminara*, ruling that such funds were attachable at the administrator level in limited circumstances, namely "in order to satisfy an order whose purpose is to enforce an obligation of support." *Young v. Young*, 488 A.2d 264, 268 (Pa. 1985). In allowing attachment even while the funds remained in the administrator's hands, we neither displaced nor disapproved of the language in those cases regarding use of legal process to access the funds *after* disbursement.

received it, the government's authority ceases'") (quoting *In re Stein*, 180 A. 577, 579 (Pa. Super. 1935)).[14]

When Marsha agreed to "waive all rights, title, and interest in [Michael's] Police Pension" and "agree[d] to sign any necessary paperwork, including a statement in writing that she waives the benefits and instructs her estate to make payment of any benefits it may receive to a beneficiary designated by" Michael, PSA at 8, she made a legally enforceable bargain, concomitantly exposing herself to legal process if she refused to make good on her contractual obligations. *See also id.* at 10-11 (providing that "the other party [would] have the right to sue for damages for [a] breach" of the PSA). PMRS legally could not divert Michael's pension payments directly to the Estate or Jeffrey. But nothing in the text of the provisions of the PPFL, MPPL, or PMRL cited by Breidenbach, 53 P.S. §§ 764, 776, and 881.115(a), forbade Marsha from making commitments regarding the benefits' disposition upon her receipt. Those provisions do not preclude a court from enforcing a contract contemplating that the beneficiary transfer the benefits after

---

[14]     Our research reveals that the Supreme Court of the United States has interpreted similar federal statutory language to protect funds even after disbursement. *See, e.g.*, *Hisquierdo v. Hisquierdo*, 439 U.S. 572, 584-87 (1979); *Philpott v. Essex Cty. Welfare Bd.*, 409 U.S. 413, 415-16 (1973); *but cf. Rose v. Rose*, 481 U.S. 619, 633 (1987) (allowing attachment at the pre-disbursement stage pursuant to a family support order).

A federal court's interpretation of a federal statute is not binding upon this Court's interpretation of a state statute. As the "ultimate expositor[] of state law," this Court has final decision-making authority when interpreting state statutes. *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975). The General Assembly, of course, can choose to revise any statute, *see* PA. CONST. art. II, § 1, subject to the limitations imposed by our Constitutions. Pursuant to our role as interpreters of our Commonwealth's statutes, we find that the General Assembly's intent in enacting Sections 764, 776, and 881.115(a) is only to protect the pension benefits at the pre-disbursement stage.

Our *de novo* interpretation of the three statutes is consistent with how PMRS viewed the extent of its legal obligations. *See* PMRS Letter at 1 ("If [Marsha] were to enter into an agreement whereby she redistributes monies after being paid by PMRS, that is outside the scope of this agency's purview and would not affect our contractual obligation to pay her the entitled joint annuity benefit."); *see also* N.T. at 178, 184.

disbursement, such as in the PSA.  The lower court did exactly that in this case, the Superior Court affirmed, and we agree.  Marsha's obligations under the PSA were enforceable and now apply against her estate.  Thus, we affirm the decision of the Superior Court, and we remand for further proceedings consistent with this opinion.

Chief Justice Saylor and Justices Baer, Todd, Donohue, Dougherty and Mundy join the opinion.