RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 24a0185p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

STANDARD INSURANCE COMPANY,

*Plaintiff*,

*v.*

JOEL MICHAEL GUY, JR.,

*Defendant-Appellant*,

CRYSTAL MICHELLE DENNISON; ANGELA CRAIN; ALVIN MADERE, JR.; PAULA MADERE KINLER,

*Defendants-Appellees*.

No. 21-5562

─────────────────

Appeal from the United States District Court for the Eastern District of Tennessee at Greeneville.
No. 2:18-cv-00074—Clifton Leland Corker, District Judge.

Argued:  January 25, 2024

Decided and Filed:  August 19, 2024

Before:  GRIFFIN, BUSH, and LARSEN, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:**  Aaron Z. Roper, WILLIAMS & CONNOLLY LLP, Washington, D.C., for Appellant.  James W. Friauf, LAW OFFICE OF JAMES W. FRIAUF, Knoxville, Tennessee, for Appellees.  **ON BRIEF:**  Aaron Z. Roper, WILLIAMS & CONNOLLY LLP, Washington, D.C., for Appellant.  James W. Friauf, LAW OFFICE OF JAMES W. FRIAUF, Knoxville, Tennessee, for Appellees Dennison and Crain.  Michael Hoover, INTERPLEADER LAW, LLC, Baton Rouge, Louisiana, for Appellees Madere and Kinler.

———————————

**OPINION**

———————————

LARSEN, Circuit Judge.  Joel M. Guy, Jr. brutally murdered his parents with the calculated goal of collecting the proceeds of his mother's insurance plans.  He argues that the Employee Retirement Income Security Act of 1974 (ERISA) requires that he receive those benefits.  The district court disagreed, concluding either that ERISA does not preempt Tennessee's slayer statute or that the federal common law prevents Guy from benefitting from his murders.  Guy now appeals.  We AFFIRM.

I.

Around Thanksgiving of 2016, Joel M. Guy, Jr. murdered his mother and father, and then dismembered their remains.  The details are horrific, and Guy's motivation was expressly financial.  *See State v. Guy*, 679 S.W.3d 632, 643–51 (Tenn. Crim. App. 2023), *perm. app. denied* (Tenn. Nov. 16, 2023), *cert. denied*, 2024 WL 2262393 (U.S. May 20, 2024).  A Tennessee jury found Guy guilty of "two counts of first degree premeditated murder, two counts of felony murder, and two counts of abuse of a corpse."  *Id.* at 643.

Guy's mother participated in life insurance and accidental death and dismemberment insurance plans through her employer.  She also insured Guy's father under the dependent provisions of the plans.  She named Guy and Guy's father (Guy, Sr.) as the plan beneficiaries. The plans are governed by ERISA, 29 U.S.C. § 1001, *et seq*.  Despite his matricide, Guy claims the proceeds of his mother's plans.

The district court, interpreting the plan documents, determined that absent Guy's disqualification, he would be "entitled to the entirety of Mrs. Guy's death benefits" and "a one-third share of Guy, Sr.'s dependent benefits" along with his half-sisters, Angela Crain and Crystal Michelle Dennison.  *Standard Ins. Co. v. Guy*, 2021 WL 2410667, at *1 (E.D. Tenn. May 20, 2021).  But if Guy were disqualified by virtue of having killed his parents, "the death benefits would go to . . . Alvin Madere, Jr. and Paula Madere Kinler," Guy's aunt and uncle.  *Id.* And Guy's half-sisters would be entitled to "Guy, Sr.'s dependent benefits, . . . in equal shares."

*Id.* Aside from the issue of Guy's entitlement to the benefits, no party has disputed this calculation on appeal.

Standard Insurance Company initiated this case as an interpleader action to determine who is entitled to the benefits. Madere and Kinler, as well as Dennison and Crain, brought cross- and counter-claims for a declaratory judgment that Guy was not entitled to the benefits. Madere and Kinler also brought a cross-claim against Guy for wrongful death, "asserted alternatively in the event the Court does not declare that [Guy] is legally disqualified from receiving the interpleaded death benefits." Answer, R. 18, PageID 155. After Standard Insurance deposited the insurance proceeds with the district court, the court dismissed it from the case. Guy's family members moved for summary judgment, arguing that Guy was disqualified from any of the plan proceeds under Tennessee's slayer statute, Tenn. Code Ann. § 31-1-106 (2017), or federal common law. Guy opposed the motions pro se, arguing that ERISA preempts Tennessee's slayer statute. He also argued that no federal common-law slayer rule deprived him of the insurance proceeds. Guy separately moved to dismiss Madere and Kinler's wrongful-death cross-claim as time-barred.

The district court granted the family members' motions for summary judgment, denied Guy's motion for summary judgment, and denied as moot Guy's motion to dismiss the wrongful-death cross-claim. *Guy*, 2021 WL 2410667, at *4 & n.6. The district court reasoned that ERISA "does not address the proper designation of beneficiaries where a beneficiary feloniously kills the insured," so either Tennessee law or federal common law must supply the rule of decision. *Id.* at *3 & n.5. And because both Tennessee law and federal common law would disqualify Guy, it did not need to address whether ERISA preempts Tennessee's slayer statute. *See id.* at *3. The court directed the entry of judgment and ordered the clerk to close the case. Guy timely appealed.

A different panel of this court appointed counsel to represent Guy. We review the district court's summary-judgment decision de novo. *El-Khalil v. Oakwood Healthcare, Inc.*, 23 F.4th 633, 634 (6th Cir. 2022).

II.

This case concerns the benefits of an ERISA employee welfare benefit plan. The question is: whom should the plan administrator pay when the plan-designated beneficiary has intentionally murdered the plan participant? To answer that question, we must first consider what source of law provides the rule of decision.

A.

If Tennessee law provides the rule of decision, Guy is not entitled to the proceeds of his mother's policies. The Tennessee slayer statute provides that "[t]he felonious and intentional killing of the decedent . . . [r]evokes any revocable . . . [d]isposition or appointment of property made by the decedent to the killer in a governing instrument." Tenn. Code Ann. § 31-1-106(c)(1)(A). And, were there any doubt, the statute also provides that a "wrongful acquisition of property or interest by a killer not covered by this section must be treated in accordance with the principle that a killer cannot profit from the killer's wrong." *Id.* § 31-1-106(f). The Tennessee law, therefore, would prevent Guy from recovering the proceeds of his mother's plans.[1]

But federal, rather than state, law governs most issues involving ERISA plans. That's because ERISA, by its terms, "supersede[s] any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. § 1144(a). This provision is "so broadly worded that the Supreme Court has struggled to draw boundaries around its scope." *Sherfel v. Newson*, 768 F.3d 561, 564 (6th Cir. 2014). And, even setting aside express preemption, conflict-preemption principles derived from the Supremacy Clause require state law to give way when "compliance with both federal and state regulations is a physical impossibility" or "where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Boggs v. Boggs*, 520 U.S. 833, 844 (1997) (citation omitted). So it is rare for state law to provide the rule of decision in an ERISA

---

[1]Guy asserts that the district court analyzed the Tennessee statute current in 2017, rather than the version in effect when Guy murdered his parents. Guy argues that the statute in effect in 2016 controls. Guy does not maintain, however, that he would recover under the 2016 statute even absent ERISA preemption. So we do not address this contention.

dispute—though it is not unheard of. *See Rutledge v. Pharm. Care Mgmt. Ass'n*, 592 U.S. 80, 83 (2020) (ERISA does not preempt state law that regulates reimbursement rates set by pharmacy benefit managers); *Associated Builders & Contractors v. Mich. Dep't of Lab. & Econ. Growth*, 543 F.3d 275, 277 (6th Cir. 2008) (ERISA does not preempt a state law "governing the training of apprentice electricians").

This case concerns the beneficiary designation for an ERISA plan. With respect to that issue, our cases have taken an almost categorical tone. We have repeatedly held that "[t]he designation of beneficiaries plainly relates to" ERISA plans, and so we have discerned "no reason to apply state law." *McMillan v. Parrott*, 913 F.2d 310, 311 (6th Cir. 1990); *see also Metro. Life Ins. Co. v. Marsh*, 119 F.3d 415, 420 (6th Cir. 1997); *Metro. Life Ins. Co. v. Pressley*, 82 F.3d 126, 129 (6th Cir. 1996). Instead, we have said the beneficiary designation "fall[s] under ERISA's broad preemptive reach and [is] consequently governed by federal law." *Tinsley v. Gen. Motors Corp.*, 227 F.3d 700, 704 (6th Cir. 2000).

Still, the particular question of whether ERISA preempts state slayer statutes is not entirely free from doubt. In *Egelhoff v. Egelhoff*, the Supreme Court concluded that ERISA preempted a state law that automatically revoked an ex-spouse's beneficiary status upon divorce from the plan participant. 532 U.S. 141, 144, 146 (2001). Yet the Court expressly reserved the question whether state slayer statutes—which could similarly revoke a murderer's beneficiary designation—might properly provide the rule of decision in a case such as ours, despite ERISA's broad preemptive reach. *Id.* at 152. And our only sister circuit to have addressed the question concluded that ERISA does not preempt state slayer statutes. *See Laborers' Pension Fund v. Miscevic*, 880 F.3d 927, 934 (7th Cir. 2018).

At the end of the day, though, we need not definitively resolve the preemption issue left open in *Egelhoff* because it does not affect the resolution of this case. Guy cannot recover under Tennessee law, and he also cannot recover under federal law.[2]

---

[2]Our conclusion that we need not resolve the preemption issue applies equally to Guy's express-preemption argument and his conflict-preemption argument. Neither theory of preemption detracts from our conclusion that even if ERISA preempts Tennessee's slayer statute, federal law prohibits Guy from recovering the proceeds of his mother's plans.

B.

Assuming that ERISA preempts Tennessee's slayer statute, we look to federal law to determine whom the plan administrator should pay. We begin, of course, with "the statutory language." *Tinsley*, 227 F.3d at 704 (quoting *McMillan*, 913 F.2d at 311). Thus, our first question is whether ERISA's text answers whether the person designated as a plan beneficiary is entitled to life insurance proceeds after he murders the plan participant.

ERISA's text does not specifically address the slayer question. Guy, nonetheless, argues that ERISA provides an answer. As he reads the statute, ERISA compels unwavering adherence to the plan documents when it comes to beneficiary designations. ERISA mandates that employee benefit plans "be established and maintained pursuant to a written instrument" that must "specify the basis on which payments are made to and from the plan." 29 U.S.C. § 1102(a)(1), (b)(4). And ERISA requires that plan fiduciaries act "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with" other provisions of ERISA. *Id.* § 1104(a)(1)(D). Thus, Guy argues, if a plan itself is silent on how to handle a slayer scenario, the administrator must pay a slayer who is named as a beneficiary pursuant to the plan documents.

At first blush, Guy's position seems to find support in *Kennedy v. Plan Administrator for DuPont Savings & Investment Plan*, 555 U.S. 285 (2009). In *Kennedy*, the Court concluded that a plan administrator properly paid pension benefits to a deceased participant's ex-wife (the named beneficiary in the plan documents), rather than honor her common-law waiver of any interest in those benefits. *Id.* at 299–300. ERISA, the Court held, requires "follow[ing] plan documents in distributing benefits" rather than a common-law waiver doctrine that would foment litigation "over the meaning and enforceability of purported waivers." *Id.* at 301–02. A pay-the-designated-beneficiary rule, the Court explained, eliminates the need for "a plan administrator to figure out whether a claimed federal common law waiver was knowing and voluntary, whether its language addressed the particular benefits at issue, and so forth, on into factually complex and subjective determinations." *Id.* And, to be sure, the Court used strong language in examining the virtues of ERISA's pay-the-designated-beneficiary rule. *E.g.*, *id.* at 302 (referring to "the bright-line requirement to follow plan documents in distributing benefits").

But *Kennedy* itself provided several reasons to believe that ERISA's pay-the-designated-beneficiary rule admits of some, if few, exceptions.  To start, the Court expressly said as much, noting that the rule and its attendant "guarantee of simplicity is not absolute."  *Id.* at 301.  And the Court's logic rested on the notion that both the plan participant (William) and his ex-wife (Liv) had ways of effectuating their intent through the plan itself:  "The plan provided an easy way for William to change the [beneficiary] designation, but for whatever reason he did not.  The plan provided a way to disclaim an interest in the [pension plan,] but Liv did not purport to follow it."  *Id.* at 303.  When the plan "giv[es] a plan participant a clear set of instructions for making his own instructions clear," *Kennedy* says the pay-the-designated-beneficiary rule prevails.  *Id.* at 301.  But the pay-the-designated-beneficiary rule, the Court told us, would not necessarily resolve "a situation in which the plan documents provide no means for a beneficiary to renounce an interest in benefits."  *Id.* at 303 n.13.  In a similar vein, the Court took pains to make clear that *Kennedy* did not resolve the "slayer" scenario in which a designated beneficiary murders the plan participant.  *Id.* at 304 n.14; *see also Egelhoff*, 532 U.S. at 152.  So, although *Kennedy* assuredly established the general rule for the mine run of cases, we do not read it to have rigidly foreclosed all exceptions to ERISA's pay-the-designated-beneficiary rule.

Indeed, our cases—before and after *Kennedy*—have rejected the notion that an ERISA plan's "beneficiary designation form" invariably tells a plan administrator whom to pay.  *See Tinsley*, 227 F.3d at 704 n.1; *Union Sec. Ins. Co. v. Blakeley*, 636 F.3d 275, 276 (6th Cir. 2011) (recognizing that, although the plan documents are "the much preferred source," "courts do sometimes resort to federal common law to identify beneficiaries under ERISA plans"); *cf. Bloemker v. Laborers' Loc. 265 Pension Fund*, 605 F.3d 436, 444 (6th Cir. 2010) (holding that the doctrine of estoppel, in "appropriate circumstances," can justify a narrow departure from "the plan documents").  Most relevant here, in *Tinsley* we held that in cases of forgery, "undue influence," or where the beneficiary designation is "otherwise improperly procured," an administrator must look beyond the beneficiary designation itself to determine whom to pay. 227 F.3d at 704.

Guy does not argue that *Kennedy* abrogated *Tinsley*, or that an administrator must follow the pay-the-designated-beneficiary rule when confronted with forgery, fraud, or undue influence.

Instead, Guy tries to distinguish *Tinsley* on the ground that it applies only when "the validity of a plan document itself" is at question. Appellant Br. at 43 (quoting *Tinsley*, 227 F.3d at 704 n.1). We are not convinced that the case is so readily distinguished. It would be one thing if *Tinsley* dealt only with an allegation of forgery, rendering the beneficiary designation invalid because it is a fake. Of course, it makes no sense that ERISA's pay-the-designated-beneficiary rule would attach to a sham beneficiary designation.

But cases involving undue influence or a fraudulently procured designation are different. *Tinsley*, 227 F.3d at 704. They deal with genuine documents, not counterfeits; yet they nonetheless invalidate the beneficiary designation. These doctrines reflect the principle that a wrongdoer should not profit from his wrong, and question whether we can be confident that a benefactor would have designated the same beneficiary had she known the true facts. *See, e.g.*, Restatement (Third) of Property: Wills and Other Donative Transfers § 8.3 cmt. e (Am. L. Inst. 2003) ("The doctrine of undue influence protects against overreaching by a wrongdoer seeking to take unfair advantage of a donor who is susceptible to such wrongdoing . . . . A donative transfer is procured by undue influence if the influence exerted over the donor overcame the donor's free will and caused the donor to make a donative transfer that the donor would not otherwise have made."); *id.* cmt. j (similar justifications for fraud). *Tinsley* held that ERISA's pay-the-designated-beneficiary rule does not control scenarios implicating these doctrines. 227 F.3d at 704.

A case involving a designated beneficiary who murders a life insurance plan participant is much like the undue-influence and fraud scenarios that *Tinsley* held fall outside ERISA's pay-the-designated-beneficiary rule. After all, the slayer rule, like the doctrines of undue influence and fraud, is justified in part by the recognition that the law prohibits a wrongdoer from benefitting from his crime and in part by assumptions about the donor's intent. *See Mut. Life Ins. Co. v. Armstrong*, 117 U.S. 591, 600 (1886) (invoking absurdity of wrongdoer benefitting from wrongdoing); *Shoemaker v. Shoemaker*, 263 F.2d 931, 932 (6th Cir. 1959) (per curiam) (same); *Prudential Ins. Co. of Am. v. Athmer*, 178 F.3d 473, 475–76 (7th Cir. 1999) (collecting cases for the same point); *id.* at 477 (collecting cases for the proposition that "the victim would not have made the murderer his heir (or the beneficiary of his life insurance policy) had he known what

the future held"); *see also* Fredrick E. Vars, *The Slayer Rule: An Empirical Examination*, 48 ACTEC L.J. 201, 204–05 (2023); *see generally* Mary Louise Fellows, *The Slayer Rule: Not Solely a Matter of Equity*, 71 Iowa L. Rev. 489 (1986).

At the same time, a slayer case has little in common with the situation the Supreme Court confronted in *Kennedy*. There is no reason to think that the Kennedy divorce implicated the maxim that wrongdoers may not profit from their wrongs. And the Court described prominently how Kennedy's pension plan afforded both William and Liv, well aware of their divorce, the opportunity to effectuate their wishes. *Kennedy*, 555 U.S. at 288–89, 303 & n.13. Mrs. Guy, by contrast, presumably was unaware that her son, whom she had just hosted for a family Thanksgiving, was about to murder and dismember her and her husband. *Guy*, 679 S.W.3d at 644, 647. Had she known "what the future held," she surely "would not have made the murderer" the "beneficiary of [her] life insurance policy." *Athmer*, 178 F.3d at 477. And her ERISA plans, themselves lacking a "slayer" provision, provided no way for her to prepare for that gruesome contingency. Finally, in the narrow circumstances we confront here, a slayer rule does not require a plan administrator to make "factually complex and subjective determinations," unaccounted for in plan documents. *Kennedy*, 555 U.S. at 302. A Tennessee jury has already made those, and its findings remain undisturbed after appeal. *See Guy*, 679 S.W.3d at 656, *perm. app. denied* (Tenn. Nov. 16, 2023), *cert. denied*, 2024 WL 2262393 (U.S. May 20, 2024).

In sum: ERISA's text does not provide a rule expressly directed toward the slayer scenario. And ERISA's pay-the-designated-beneficiary rule, while broadly applicable, "is not absolute." *Kennedy*, 555 U.S. at 301; *see Tinsley*, 227 F.3d at 704. The slayer scenario is more like the doctrines of undue influence and fraud addressed in *Tinsley* than the divorce and waiver at issue in *Kennedy*. Thus, we "find[] no answer" to the slayer scenario in the "statutory language" of ERISA. *Tinsley*, 227 F.3d at 704 (quoting *McMillan*, 913 F.2d at 311); *see also Kennedy*, 555 U.S. at 304 n.14 (expressly reserving the slayer scenario); *Egelhoff*, 532 U.S. at 152 (same).

C.

Because ERISA itself does not answer the question, both the Supreme Court and our precedent direct us to look to federal common law for a rule of decision. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 110 (1989) ("[W]e have held that courts are to develop a 'federal common law of rights and obligations under ERISA-regulated plans.'" (citation omitted)); *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 56 (1987); *Tinsley*, 227 F.3d at 704. Of course, resort to the federal common law is appropriate only in "few and restricted instances." *DiGeronimo Aggregates, LLC v. Zemla*, 763 F.3d 506, 511 (6th Cir. 2014) (quoting *Milwaukee v. Illinois*, 451 U.S. 304, 313–14 (1981)). But appropriate instances include where, as here, "ERISA is silent or ambiguous" or leaves an "awkward gap in the statutory scheme." *Loc. 6-0682 Int'l Union of Paper v. Nat'l Indus. Grp. Pension Plan*, 342 F.3d 606, 609 (6th Cir. 2003) (citations and internal quotation marks omitted); *see also Pension Benefit Guar. Corp. v. Findlay Indus., Inc.*, 902 F.3d 597, 609 (6th Cir. 2018); *Patterson v. Chrysler Grp., LLC*, 845 F.3d 756, 762 (6th Cir. 2017).

Guy does not argue that the federal common law lacks a slayer rule that would prevent a convicted first-degree murderer from recovering the life-insurance proceeds of his victim. Nor could he. The Supreme Court has recognized that the slayer "principle"—"which ha[s] been adopted by nearly every State—is well established in the law and has a long historical pedigree predating ERISA." *Egelhoff*, 532 U.S. at 152 (citing *Riggs v. Palmer*, 22 N.E. 188 (N.Y. 1889)). Federal courts have long applied the common-law slayer rule in the insurance context. The Supreme Court first confronted the issue in the nineteenth century, explaining that "[i]t would be a reproach to the jurisprudence of the country if one could recover insurance money payable on the death of the party whose life he had feloniously taken." *Armstrong*, 117 U.S. at 600. "As well might he recover insurance money upon a building that he had willfully fired." *Id.*

This court has followed suit, squarely applying the common-law rule in a case arising under a different federal insurance statute. *See Shoemaker*, 263 F.2d at 932. Although the statute in *Shoemaker* included "no provision for the situation where the designated beneficiary kills the insured," we held that the common law "prevent[s] such a beneficiary from taking the proceeds of the insurance, unless the beneficiary was insane at the time, or the killing was

accidental, or was committed in self-defense." *Id.* Other circuits have likewise recognized the federal common-law slayer rule in the context of other federal insurance statutes. *See Prudential Ins. Co. of Am. v. Tull*, 690 F.2d 848, 849 (4th Cir. 1982) (federal common-law slayer rule bars murderer's recovery under plan issued pursuant to Servicemen's Group Life Insurance Act); *see also Metro. Life Ins. Co. v. White*, 972 F.2d 122, 124 (5th Cir. 1992) (state law and federal common-law slayer principles bar recovery under plan issued pursuant to Federal Employees Group Life Insurance Act).

Further, early academic descriptions of the common-law slayer rule reveal that it was considered universal and near axiomatic in the insurance context. "The courts are in agreement that a beneficiary cannot maintain an action for insurance proceeds after having murdered the insured." John W. Wade, *Acquisition of Property by Willfully Killing Another—A Statutory Solution*, 49 Harv. L. Rev. 715, 717 n.8 (1936); *see also* Note, *Murder of the Insured by the Beneficiary*, 24 Harv. L. Rev. 227, 227 (1911). Case annotations reported the same: "[T]he beneficiary's right to recover under the insurance contract is forfeited by reason of the felonious killing of the insured by the beneficiary." *See* Annotation, *Right of Executor or Administrator of Insured's Estate to Recover Proceeds of Policy Where the Beneficiary's Criminal Act Caused, or Contributed to, Insured's Death*, 7 A.L.R. 828 (1920). Early insurance treatises agreed: The common law "will not allow a recovery" "when the beneficiary feloniously causes the death of the insured." William Reynolds Vance, *Handbook of the Law of Insurance* 189, 392 (1904); *see also* 4 Roger W. Cooley, *Briefs on the Law of Insurance* 3153–55 (1905). And this rule endured through and beyond 1974, when Congress passed ERISA. *Egelhoff*, 532 U.S. at 152. *See, e.g.*, *Franklin Life Ins. Co. v. Strickland*, 376 F. Supp. 280, 282 (N.D. Miss. 1974) ("For whether the law of Alaska, Mississippi or other jurisdiction should here apply, it is generally settled that the beneficiary of a life insurance policy who intentionally and feloniously takes the life of the assured is precluded from recovering the policy proceeds[.]"); *Neff v. Mass. Mut. Life Ins. Co.*, 107 N.E.2d 100, 102 (Ohio 1952) ("[I]t is well settled everywhere that, even in the absence of a statute so providing, the beneficiary of an insurance policy who feloniously kills the insured can not take under the policy."); *see also* Annotation, *Killing of Insured by Beneficiary as Affecting Life Insurance or Its Proceeds*, 27 A.L.R.3d 794 (1969); 4 Jordan R. Plitt et al., *Couch on*

*Insurance* § 62:1 (3d ed. June 2024 update) ("A beneficiary who unlawfully kills the insured is generally barred from receiving the proceeds of insurance.").

The slayer rule thus enjoys a "long historical pedigree" that was already firmly entrenched in the common law when Congress enacted ERISA. *Egelhoff*, 532 U.S. at 152. When "a common-law principle is well established, . . . the courts may take it as given that Congress has legislated with an expectation that the principle will apply except when a statutory purpose to the contrary is evident." *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 108 (1991) (quotation marks and citations omitted). ERISA's text evinces no such purpose. And it is hard to conceive "that a statute written with an eye on the old law," *Kennedy*, 555 U.S. at 294, and whose "principal object" is "to protect plan participants and beneficiaries," *Boggs*, 520 U.S. at 845, aimed to discard the well-established common-law slayer rule in favor of incentivizing murder for profit. Assuming that ERISA preempts Tennessee's slayer statute, the federal common-law slayer rule controls in this case.

The only question that remains is whether Guy's conduct falls within the scope of the rule. It does. Some jurisdictions applied a few narrow exceptions to the slayer rule in the life-insurance context, and it is possible that those exceptions exist within the federal common-law rule. For example, we have said that the doctrine does not apply to a beneficiary who acted in self-defense or by accident. *See, e.g.*, *Shoemaker*, 263 F.2d at 932. Yet no exception applies to Guy; his case lies at the core of the common-law prohibition. A jury convicted Guy of first-degree premeditated murder for killing his mother and father. *See Guy*, 679 S.W.3d at 643. That conviction was affirmed on appeal. *Id.* at 693. And the Supreme Court of Tennessee denied Guy's application for permission to appeal, rendering his conviction final. *State v. Guy*, No. E2021-00560-SC-R11-CD (Tenn. Nov. 16, 2023).

Thus, whether under Tennessee's slayer statute or the federal common law, Guy's murderous act disqualifies him from benefitting from his mother's ERISA policies.

We AFFIRM.