NOT RECOMMENDED FOR PUBLICATION
File Name: 26a0025n.06

Case No. 25-1689

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Jan 13, 2026
KELLY L. STEPHENS, Clerk

PIATT LAKE BIBLE CONFERENCE
ASSOCIATION,

    Plaintiff - Appellant,

v.

CHURCH MUTUAL INSURANCE
COMPANY,

    Defendant - Appellee.

)
)
)
)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MICHIGAN

OPINION

Before: BATCHELDER, CLAY, and RITZ, Circuit Judges.

**RITZ, Circuit Judge.** Piatt Lake Bible Conference Association (PLBCA) held a blanket insurance policy with Church Mutual Insurance Company. The policy insured PLBCA's buildings up to approximately $3.5 million but included a $100,000 sub-limit for code-compliance costs. Church Mutual told PLBCA it had full replacement coverage for the buildings.

In March 2020, one of PLBCA's buildings collapsed. PLBCA alleges that the code-compliance costs to rebuild exceeded the $100,000 sub-limit by $1.3 million. PLBCA sued Church Mutual in tort for the $1.3 million, alleging that Church Mutual's full-coverage representations made Church Mutual liable for code-compliance costs exceeding the policy limit. The district court dismissed PLBCA's claims on summary judgment. We affirm.

**BACKGROUND**

I.      **Facts**

      A.      **PLBCA and the Miracle Building**

PLBCA is a nonprofit religious organization that has operated in Michigan since the 1940s. PLBCA owns approximately 18 buildings on 3,500 acres, including the "Miracle Building," which is the subject of this dispute. Built in 1973, the Miracle Building was a two-story multi-purpose log building housing an auditorium, dining hall, kitchen, and other rooms. Due to its age, the Miracle Building lacked many new features required for modern code compliance. For example, the original Miracle Building did not have heating, ramps, an elevator, a fire-suppression system, or a pump-fed septic system.

      B.      **The insurance policy**

Since the 1970s, PLBCA has held several insurance policies with Church Mutual. The policy at issue here provided blanket "replacement cost" coverage up to $3,571,200 per occurrence for PLBCA's 18 buildings, including the Miracle Building. RE 53-4, Policy, PageID 1277, 1286, 1324. In addition to the replacement cost coverage, the policy included a coverage sub-limit of $100,000 per occurrence for construction costs related to compliance with any ordinance, law, or code. This meant that, in the event of loss, Church Mutual would pay only up to $100,000 for the cost of bringing an old building up to code.

      C.      **Church Mutual's conduct**

PLBCA alleges that Church Mutual's various statements and conduct erroneously led PLBCA to believe that it would be covered to fully rebuild the Miracle Building, including all code-compliance costs, regardless of the policy's $100,000 code-compliance cap. To support this claim, PLBCA points to three primary instances of conduct.

First, a Church Mutual brochure stated that Church Mutual provides "On-Site Risk and Insurance Needs Analysis." RE 54-2, Brochure, PageID 1984; RE 1-2, Compl., PageID 16. The brochure explained:

> One of the first steps of our relationship is a detailed, on-site risk and insurance needs analysis. Our specialists will measure your building(s) to establish replacement values based on current construction costs. And we'll ask about your programs and activities to identify exposures. The information we gather forms the basis of your customized proposal.

RE 54-2, Brochure, PageID 1984; RE 1-2, Compl., PageID 16. But PLBCA presents no evidence that PLBCA received, reviewed, or otherwise engaged with this brochure.

Second, in 2014, PLBCA board member Dennis Lintemuth discussed the policy with Church Mutual agent Stephen Loos over the phone and via email. Lintemuth asked whether Loos could provide "a value for each building" and whether Loos would "recommend [PLBCA] have 'replacement cost' on many of these building[s.]" RE 53-9, Lintemuth Emails, PageID 1752; RE 53-8, Lintemuth Dep., PageID 1671-72. Lintemuth also asked whether the policy "100% covered" PLBCA such that there would be no "'under valued' problem with any potential claim in the future." RE 53-10, Lintemuth Emails, PageID 1754; RE 53-8, Lintemuth Dep., PageID 1673. In response, Loos confirmed that the policy covered "replacement costs" for PLBCA's buildings, RE 53-8, Lintemuth Dep., PageID 1672-73, and that "the limits should protect [PLBCA] fully on each building," RE 53-10, Lintemuth Emails, PageID 1755. Lintemuth later testified that these questions concerned the blanket nature of the policy—specifically, whether the $3.5 million total policy limit would cover the cumulative value of PLBCA's buildings, given that the $3.5 million policy limit applied whether "[PLBCA] had one building go down" or "all" of its buildings go down. RE 53-8, Lintemuth Dep., PageID 1672. Lintemuth also explained that he understood Loos's statements to mean that the policy covered "the cost of replacing what [PLBCA] actually

had," or the cost to "reproduce," "replicate," or "reconstruct" a building "the same way as it was—same square footage, everything the same." *Id.* at PageID 1672-74. For example, "if the original building did not have a sprinkler system," that would not be a covered replacement cost. *Id.*

Third, in 2019, PLBCA board president Vicky Welty met with Church Mutual agent Beth Kroeger to review PLBCA's policy and take Kroeger on a site tour of PLBCA's buildings. In the meeting, Welty said that "all [PLBCA] want[s] to know is that we are fully covered" with "replacement coverage[] for each of the buildings." RE 53-11, Welty Dep., PageID 1771, 1773. Although Welty does not remember Kroeger's specific response, Welty testified that Kroeger made her feel "very comfortable coming out of that meeting that [PLBCA was] well taken care of." *Id.* at PageID 1771-74. Welty understood her "fully covered" inquiry to mean that "[i]f something happens to one of [PLBCA's] buildings, [PLBCA is] fully covered to build it back." *Id.* at PageID 1771. Welty further explained that the Board "all sort of thought $3.5 million was plenty to [re-]build [the Miracle Building.]" *Id.* Welty did not recall Kroeger explaining how the code-compliance limit would affect PLBCA's coverage.

### D. The code-compliance coverage dispute

In March 2020, the Miracle Building collapsed due to snow and ice, so PLBCA submitted a claim to Church Mutual. Church Mutual accepted the claim and determined that the Miracle Building's total replacement value, which Church Mutual would pay to PLBCA, was approximately $2.3 million.

PLBCA then entered a contract with Nomad Construction Company to design and rebuild the Miracle Building. Nomad estimated it would cost $3.7 million to rebuild—$1.4 million more than Church Mutual's estimated replacement cost coverage. The $3.7 million estimate included a new building layout, design, and code-compliance upgrades needed to pass modern inspection

standards. PLBCA alleges that the costs exceeding Church Mutual's $2.3 million coverage amount—$1.4 million—consisted entirely of code-compliance costs.[1] But Church Mutual refused to cover code-compliance costs beyond the $100,000 policy cap. In February 2022, despite the $1.4 million cost differential between Nomad's estimate and Church Mutual's estimate, PLBCA began construction on the newly designed Miracle Building.

## II. Procedural history

In 2023, PLBCA sued Church Mutual in Michigan state court, alleging five theories of tort recovery across six claims: intentional misrepresentation and fraudulent inducement (Count I), promissory estoppel (Count II), silent fraud (Count III), negligent misrepresentation regarding complete coverage (Count IV), innocent misrepresentation (Count V), and negligent misrepresentation regarding replacement costs (Count VI). PLBCA later dropped Count VI. PLBCA sought approximately $1.3 million from Church Mutual—the difference between PLBCA's alleged $1.4 million code-compliance costs and the $100,000 code-compliance coverage that Church Mutual owed under the policy. PLBCA alleged that, although the express language of the policy limited code-compliance coverage to $100,000, Church Mutual's conduct made the insurer liable for code-compliance costs exceeding that limit.

Church Mutual removed the case to federal court and filed two successive motions for summary judgment. The district court denied the first but granted the second, finding that PLBCA failed to show both duty and reliance—two required elements for PLBCA's various fraud, misrepresentation, and promissory estoppel claims. PLBCA timely appealed. We have jurisdiction under 28 U.S.C. § 1291.

---

[1] An independent expert hired by Church Mutual estimated the required code-compliance costs to be $660,841.03, which is less than half PLBCA's and Nomad's code-compliance cost estimate.

**ANALYSIS**

Under Michigan law, although "the relationship between the insurer and insured is a contractual one," *Harts v. Farmers Ins. Exch.*, 597 N.W.2d 47, 50 (Mich. 1999) (citation modified), insureds may bring common law tort claims against insurers if the "tortious conduct exist[s] independent of the [contract]," *Kewin v. Mass. Mut. Life Ins. Co.*, 295 N.W.2d 50, 55 (Mich. 1980); *see also Harsh v. Sykora*, No. 206011, 1999 WL 33453797, at *4 (Mich. Ct. App. Mar. 5, 1999) (per curiam) ("[A] fraud claim is a distinct tort action, irrespective of whether the underlying contract is enforceable."). And here, because the forum state is Michigan, we apply Michigan law. *SHH Holdings, LLC v. Allied World Specialty Ins. Co.*, 65 F.4th 830, 836 (6th Cir. 2023) ("In a diversity case, we apply the substantive law of the forum state.").

PLBCA does not dispute the terms of the contract, nor Church Mutual's performance under the contract. Instead, PLBCA brings common law fraud, misrepresentation, and promissory estoppel claims, alleging that Church Mutual's extra-contractual statements made Church Mutual liable in tort for code-compliance costs exceeding the contractual amount. Church Mutual responds that PLBCA's claims fail for lack of duty and lack of reliance. We agree with Church Mutual.

I.      **Standard of review**

"We review the district court's summary-judgment decision de novo." *Standard Ins. Co. v. Guy*, 115 F.4th 518, 521 (6th Cir. 2024). Summary judgment requires the movant, who bears the initial burden of proof, to "show[] that there is no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Where the movant has met this burden, the burden shifts to the nonmovant to identify "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986)

(citing Fed. R. Civ. P. 56(e)).  On a motion for summary judgment, all allegations and reasonable inferences must be construed "in the light most favorable" to the nonmovant.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation modified).

## II.     PLBCA's fraud claims fail for lack of duty.

### A.     The separate-and-distinct-duty rule applies.

Where the parties have a contract, tort claims may only proceed if "tortious conduct exist[s] independent of the [contract]." *Kewin*, 295 N.W.2d at 55.  Independent tortious conduct requires "the plaintiff [to] allege[] a violation of a duty separate and distinct from the underlying contractual obligation." *Smith Living Tr. v. Erickson Ret. Cmtys.*, 928 N.W.2d 227, 244 (Mich. Ct. App. 2018). This is often referred to as "the separate-and-distinct-duty test." *Precision Standard, Inc. v. ADP Tax Servs., Inc.*, No. 373820, 2025 WL 3532769, at *1 (Mich. Ct. App. Dec. 9, 2025) (per curiam). The purpose of the separate-and-distinct-duty test is to delineate "the sometimes confusing dividing line between contract actions and tort actions."  *Fraser Engine Rebuilder, Inc. v. Lancaster*, No. 360110, 2023 WL 5281853, at *6 (Mich. Ct. App. June 8, 2023) (per curiam) (citing *Hart v. Ludwig*, 79 N.W.2d 895, 898 (Mich. 1956)).

Under the separate-and-distinct-duty test, claims of fraud and misrepresentation "are permissible" where they are "extraneous to the contract" and not "interwoven with [a] breach of contract [claim]." *DBI Invs., LLC v. Blavin*, 617 F. App'x 374, 382 (6th Cir. 2015) (quoting *Huron Tool & Eng'g Co. v. Precision Consulting Servs., Inc.*, 532 N.W.2d 541, 545 (Mich. Ct. App. 1995)).  To illustrate, a viable fraud claim, separate and distinct from a contract, may exist where the fraud "cause[d] harm to the plaintiffs distinct from [the contract,]" or where the "factual allegations" are distinct from a breach of contract claim.  *PSP Stores, LLC v. Ford*, No. 338241, 2018 WL 4164423, at *4 (Mich. Ct. App. Aug. 30, 2018) (per curiam).

The separate-and-distinct-duty rule also applies to claims of fraudulent inducement. *See Gen. Motors Corp. v. Alumi-Bunk, Inc.*, No. 270430, 2007 WL 2118796, at *9 (Mich. Ct. App. July 24, 2007) (per curiam), *rev'd in part*, 757 N.W.2d 859 (Mich. 2008) (Kelly, J., dissenting) ("Pursuant to *Huron Tool*, a claim for fraudulent inducement must be separate from the claim of breach of contract."); *Gen. Motors Corp. v. Alumi-Bunk, Inc.*, 757 N.W.2d 859 (Mich. 2008) (reversing the Court of Appeals and adopting the dissent's analysis).[2]

### B. PLBCA has not shown that Church Mutual owed a separate and distinct duty to advise, so PLBCA's fraud claims fail.

Under Michigan law, "the relationship between the insurer and insured is a contractual one," and an insurance agent generally "owes no [common law] duty to advise a potential insured about any coverage" absent a "special relationship." *Harts*, 597 N.W.2d, at 50-51 (citation modified). A special relationship between an insurer and insured exists in four narrow instances: "(1) the agent misrepresents the nature or extent of the coverage offered or provided, (2) an ambiguous request is made that requires a clarification, (3) an inquiry is made that may require advice and the agent, though he need not, gives advice that is inaccurate, or (4) the agent assumes an additional duty by either express agreement with or promise to the insured." *Id.* at 52 (citation modified).

On appeal, PLBCA suggests that Church Mutual owed PLBCA a separate-and-distinct duty to advise PLBCA on the adequacy of its coverage under *Harts*. PLBCA argues that three

---

[2] For claims of promissory estoppel, the duty analysis is less straightforward. Michigan law provides generally that "no action for promissory estoppel may lie when an oral promise expressly contradicts the language of a binding contract." *Herbert v. Herbert*, No. 372281, 2025 WL 3724564, at *4 (Mich. Ct. App. Dec. 23, 2025) (per curiam) (quoting *Zaremba Equip., Inc. v. Harco Nat'l Ins. Co.*, 761 N.W.2d 151, 166 (Mich. Ct. App. 2008)); *see also DBI Invs.*, 617 F. App'x at 381, 385-86 (performing a separate-and-distinct analysis for plaintiff's fraud claims, but not for plaintiff's promissory estoppel claim, and noting that a statement "cannot be the basis for a promissory estoppel claim" where "the pertinent terms were set out in binding fashion in [a contract]"). But as set out below, PLBCA's promissory estoppel claim fails for lack of reliance anyway.

occurrences—the brochure, the 2014 exchange between Lintemuth and Loos, and the 2019 exchange between Welty and Kroeger—independently satisfy the second and third *Harts* special-relationship triggers. We disagree.

First, there is no indication the Church Mutual brochure was provided in response to a request or inquiry, so it satisfies neither the second nor third trigger. In an analogous case where the insureds merely made a "comment" and "hoped that [the insurance agent] would expand" on the policy, the Michigan Court of Appeals found the exchange "was simply a statement, not an inquiry that called for clarification" under *Harts*. *Pressey Enters., Inc. v. Barnett-France Ins. Agency*, 724 N.W.2d 503, 506 (Mich. Ct. App. 2006) (per curiam).

Next, the 2014 exchange between Lintemuth and Loos contained neither an ambiguous request nor inaccurate advice. Lintemuth conceded that his 2014 inquiries, and Loos's responses, related to the blanket nature of the policy coverage, not the code-compliance costs. Lintemuth also conceded that he understood Loos's statements to mean that PLBCA could "reproduce[]" the "same building" with the features it already had—not to rebuild the non-code-compliant building into a code-compliant one. RE 53-8, Lintemuth Dep., PageID 1673-74. Thus, Lintemuth made no ambiguous request, nor did Loos provide inaccurate advice. *See Bamal Corp. v. Chassis Powder Coating, Inc.*, No. 256412, 2005 WL 3500882, at *4 (Mich. Ct. App. Dec. 22, 2005) (per curiam) (finding no ambiguity where the statement "appears to have been understood by both parties").

Similarly, the 2019 exchange between Welty and Kroeger contained no inaccurate advice or ambiguous request. Welty admits that she does not "remember exactly what [Kroeger] said," merely that PLBCA "fe[lt] very comfortable coming out of that meeting." RE 53-11, Welty Dep., PageID 1771-74. Where the record does not reflect any actual representation, PLBCA cannot

show that the advice given, if any, was inaccurate. As the Michigan Court of Appeals has stated, where "there was no representation" by the insurance company, there can be "no inaccurate information" to trigger a *Harts* special relationship. *Akers v. Bankers Life and Cas. Co.*, No. 283771, 2009 WL 1767617, at *2-3 (Mich. Ct. App. June 23, 2009). And in *Five Waters Properties, LLC v. Bone*, the same court found no "ambiguity requiring clarification" where neither party "recalled" the actual request, suggesting similarly that no inaccurate advice exists where the parties do not recall any actual advice. No. 366075, 2024 WL 748484, at *1, 3 (Mich. Ct. App. Feb. 22, 2024) (per curiam), *appeal denied*, 12 N.W.3d 408 (Mich. 2024).

Further, Welty's alleged request for full coverage was not ambiguous because, per Welty's own admission, Welty understood "full coverage" to mean PLBCA was "fully covered to build [] back" the building up to $3.5 million. RE 53-11, Welty Dep., PageID 1771. "That the policy did not include the [code-compliance] coverage that [Welty] assumed it contained" does not transform this exchange into an ambiguous one. *Bamal*, 2005 WL 3500882, at *4. "Any underlying misunderstanding of the policy terms—which would have been easily rectified by [Welty's] reference to the written terms of [PLBCA's] policy—is not a basis for a special relationship creating a duty" on Church Mutual's part. *Id.* After all, an "insured is obligated to read the policy and raise questions concerning coverage." *Opera Block Props., Inc. v. Auto-Owners Ins. Co.*, — N.W.3d —, No. 365213, 2024 WL 3907171, at *8 (Mich. Ct. App. Aug. 22, 2024) (citation modified).

PLBCA has not shown that any of the special-relationship triggers apply. So no separate-and-distinct duty to advise exists, and PLBCA's fraud claims fail.

### III.     PLBCA's claims fail for lack of reasonable reliance.

PLBCA's various claims also fail because PLBCA cannot show that it reasonably relied on Church Mutual's alleged representation that it would cover code-compliance costs exceeding the $100,000 policy limit.  Demonstrating reliance is an essential element of each of PLBCA's claims.  For example, promissory estoppel (Count II) requires PLBCA to show reasonable reliance. *See, e.g.*, *Cnty. of Ingham v. Mich. Cnty. Rd. Comm'n Self-Ins. Pool*, 975 N.W.2d 826, 838 (Mich. 2021).   Likewise, PLBCA's remaining claims—intentional misrepresentation or fraudulent inducement (Count I), silent fraud (Count III), negligent misrepresentation (Count IV), and innocent misrepresentation (Count V)—may be "loosely aggregated under the rubric of 'fraud,'" which requires a claimant to prove reasonable reliance on the alleged misrepresentation. *Titan Ins. Co. v. Hyten*, 817 N.W.2d 562, 567-68 & n.4 (Mich. 2012); *see also DBD Kazoo LLC v. W. Mich. LLC*, — N.W.3d —, No. 361299, 2024 WL 500208, at *7 (Mich. Ct. App. Feb. 8, 2024), *appeal denied*, 16 N.W.3d 730 (Mich. 2025) (addressing "fraud and misrepresentation claims"); *Johnson v. Johnson*, No. 307572, 2013 WL 2319473, at *2 (Mich. Ct. App. May 28, 2013) (per curiam) (fraudulent inducement); *Winthrop v. Deck*, No. 338773, 2019 WL 137324, at *3 (Mich. Ct. App. Jan. 8, 2019) (per curiam) (silent fraud); *Barclae v. Zarb*, 834 N.W.2d 100, 116 (Mich. Ct. App. 2013) (per curiam) (negligent misrepresentation); *Zaremba Equip., Inc. v. Harco Nat'l Ins. Co.*, 761 N.W.2d 151, 165 (Mich. Ct. App. 2008) (*Zaremba I*) (innocent misrepresentation).

#### A.     The unambiguous terms of the contract make any alleged reliance unreasonable.

It is unreasonable for a party to rely on representations "that are contrary to the unambiguous terms of an insurance policy." *Hohensee v. Nasser Ins. Agency, Inc.*, No. 321434, 2015 WL 6835760, at *2 (Mich. Ct. App. Nov. 3, 2015) (per curiam) (citing *Zaremba I*, 761 N.W.2d at 165).  As we have observed, Michigan law "establishes that when a written contract,

with an integration clause, expressly contradicts a defendant's allegedly fraudulent representations not contained in the contract, a plaintiff's reliance on such representations cannot be reasonable." *Ram Int'l, Inc. v. ADT Sec. Servs., Inc.*, 555 F. App'x 493, 499 (6th Cir. 2014). Indeed, "there can be no fraud where a person has the means to determine that a representation is not true." *DBD Kazoo*, 2024 WL 500208, at *7 (citation modified).

Here, the unambiguous, undisputed terms of the policy limited code-compliance coverage to $100,000. Any representation suggesting that PLBCA held code-compliance coverage exceeding $100,000 directly contradicted the unambiguous language, so reliance on any such representation would be unreasonable. *See Zaremba I*, 761 N.W.2d at 165 (suggesting that a plaintiff cannot reasonably rely on similar full-coverage representations where "the insurance documents previously provided to plaintiff stated a definite coverage limit").

Moreover, "one is presumed to have read the terms of his or her insurance policy; therefore, when the insurer has made a statement that clearly conflicts with the terms of the insurance policy, an insured cannot argue that he or she reasonably relied on that statement without questioning it in light of the provisions of the policy." *Cooper v. Auto Club Ins. Ass'n*, 751 N.W.2d 443, 451-52 (2008) (citation modified). Indeed, Michigan courts have found summary judgment appropriate where "plaintiffs admitted that they did not read the insurance policy," because "it was plaintiffs' obligation to read the policy and, if they had, they would have been aware of the [extent of coverage]." *McDowell v. Moore Ins. Servs., Inc.*, No. 267853, 2006 WL 2035561, at *4 (Mich. Ct. App. July 20, 2006) (per curiam). Here, PLBCA President Welty conceded that she never attempted to read PLBCA's insurance policy, so Welty, at least, could not reasonably rely on any of Church Mutual's statements regarding coverage beyond the $100,000 code-compliance cost limit.

### B.     PLBCA cannot show actual reliance.

Also, PLBCA cannot demonstrate that it actually relied on any of Church Mutual's alleged misconduct.  "To be actionable, a misrepresentation claim requires actual reliance on a false representation." *Timmons v. DeVoll*, No. 241507, 2004 WL 345495, at *3 (Mich. Ct. App. Feb. 24, 2004) (per curiam); *see also Drake v. Auto Club Ins. Ass'n*, No. 353942, 2021 WL 1941626, at *4 (Mich. Ct. App. May 13, 2021) (per curiam) ("[T]here is no evidence that plaintiff relied upon the statement, let alone that her reliance was reasonable.").  Here, even if the unambiguous terms of the policy did not make reliance unreasonable, PLBCA has not shown that it actually relied on any Church Mutual conduct to provide code-compliance coverage beyond the $100,000 policy cap.

Again, PLBCA points to three instances where Church Mutual allegedly misrepresented the adequacy of PLBCA's code-compliance-cost coverage: the brochure, the 2014 exchange between Lintemuth and Loos, and the 2019 exchange between Welty and Kroeger.  But PLBCA has not shown actual reliance on any of these alleged misrepresentations.

First, as to the brochure, PLBCA presented no evidence that PLBCA ever received, read, or otherwise engaged with the brochure prior to the Miracle Building's collapse.  PLBCA cannot rely on a representation it did not receive.  *See VanStelle v. Macaskill*, 662 N.W.2d 41, 49 (Mich. Ct. App. 2003), *overruled on other grounds by Markel v. William Beaumont Hosp.*, 982 N.W.2d 151 (Mich. 2022).  Also, "[p]laintiff's reliance on a brochure's description of the insurance coverage cannot support a misrepresentation claim where plaintiff had the policy itself and the policy does not provide the asserted coverage." *Dupuis v. Utica Mut. Ins. Co.*, No. 250766, 2006 WL 1084336, at *8 (Mich. Ct. App. Apr. 25, 2006) (per curiam).

Second, in the 2014 exchange between Lintemuth and Loos, Loos said that "[t]he limits should protect [PLBCA] fully on each building." RE 53-10, Lintemuth Emails, PageID 1755; RE 53-8, Lintemuth Dep., PageID 1673. PLBCA cannot show it relied on this representation as to code-compliance coverage because Lintemuth conceded that this exchange related to the multi-building, blanket nature of the policy coverage. Lintemuth also conceded that he understood Loos's response to mean only that PLBCA could "reproduce[]" the "same building" with the features it already had—not to mean that PLBCA could rebuild the non-code-compliant building into a completely code-compliant one. RE 53-8, Lintemuth Dep., PageID 1673-74. Thus, PLBCA cannot show that it relied on this exchange to mean that PLBCA was fully covered for all code-compliance costs. *Cf. Groulx v. Iqbal*, No. 366784, 2024 WL 4820233, at *7 (Mich. Ct. App. Nov. 18, 2024) (per curiam) (finding no reliance where plaintiff did not believe defendants' representations to communicate the alleged misrepresentation).

Third, as to the 2019 exchange between Welty and Kroeger, Welty (like Lintemuth) admitted that she understood "fully covered" to mean that "[i]f something happens to one of [PLBCA's] buildings, [PLBCA is] fully covered to build it back." RE 53-11, Welty Dep., PageID 1771. Moreover, Welty did not "remember exactly what [Kroeger] said," merely that PLBCA "fe[lt] very comfortable coming out of that meeting." *Id.* at PageID 1771-74. So this exchange does not constitute evidence of a statement on which PLBCA could actually rely. *Cf. Sherman v. Singh*, No. 363517, 2024 WL 1336140, at *6 (Mich. Ct. App. Mar. 28, 2024) (per curiam) ("[A] party cannot be said to have reasonably relied on a . . . statement when the statement makes no assertion on which a plaintiff could actually rely.")

For these reasons, PLBCA cannot establish reasonable reliance for any of its claims.  This is an independent reason to affirm the district court's grant of summary judgment to Church Mutual.

## CONCLUSION

PLBCA seeks to recover in tort for costs which its insurance policy explicitly excluded. But PLBCA has not shown that Church Mutual owed a separate-and-distinct duty to advise.  Nor has PLBCA demonstrated that it reasonably relied on Church Mutual's alleged misrepresentations. For these reasons, we affirm.